ANDERSON CONSTRUCTION COMPA-
NY, Inc. and Montin-Benson Corpo-
ration, Joint Venturers

v.

UNITED STATES.

No. 257-58.

United States Court of Claims.

May 3, 1961.

Arthur J. Phelan, Washington, D. C., Hogan & Hartson, Washington, D. C., on briefs, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., Washington, D. C., for defendant.

LARAMORE, Judge.

This is an action for an equitable adjustment of the contract price for alleged extra work required by defendant. This claim arises out of a contract entered into between plaintiffs and the United States through the Corps of Engineers, Department of the Army, for the construction of a large fieldhouse at Eielson Air Force Base near Fairbanks, Alaska. Plaintiffs seek reimbursement for the additional cost of the alleged extra work performed by them together with a reasonable allowance for overhead and profit.

This contract was entered into pursuant to appropriate regulations pertaining to the letting of Government contracts. On February 13, 1952, invitations for bids were issued. Attached to the invitation for bids at the time of issuance were (1) the specifications; (2) 52 drawings; and (3) Addendum No. 1, listing certain changes in the specifications. Relying on the information supplied in the invitation to bid, the plaintiffs, in the person of Mr. Anderson, prepared their bid. The opening paragraph of the specifications stated that "the site of the proposed work is at Eielson Air Force Base, approximately 26 miles from Fairbanks, Alaska, as shown on the Plot Plan." However, the plot plan was not among the drawings furnished but was "to be furnished by addendum," along with the grading plan.

The 52 drawings which accompanied the specifications at the time of the issuance of the invitation for bids covered four features: architectural, structural, mechanical, and electrical. Four of the drawings depicting the basement plan showed the area underneath the floor slab as "unexcavated." Four of the drawings depicting elevation showed the top of the finish ground floor as being at elevation 0.00. The "finish grade" below the floor slab was at elevation −1.19. The existing or present grade was at elevation −4.19. Tops of footings were at elevations −6.19; bottoms at −8.19.

Upon receipt of the drawings and specifications, about the middle of February 1952, Mr. Anderson made preliminary computations in contemplation of preparing a bid for the joint venturers. He interpreted the "unexcavated" legends to mean that the contractor would not be required to excavate under the floor slab areas, except for footings and utility trenches. He understood the "existing" or "present" grade at elevation −4.19 to indicate the necessity for fill to finish grade at −1.19. His computations for excavation were therefore limited to the requirements for footings and other subsurface elements.

Addendum No. 2 was issued on February 29, 1952. It contained the drawings pertaining to the plot plan and grading plan. The printed portion of Addendum No. 2 reached Mr. Anderson during the early days of March. The drawings were somehow delayed for a few days. When he received them, less than a week remained before the bid-opening date of March 12, 1952.

The grading plan traced the outline of the building in a field of contour elevations. The highest elevation in the vicinity of the building was 544 feet, while the lowest was 530 feet. Within the perimeter of the building's outlines the highest elevation was 536 feet and the lowest 530 feet. The grading plan further showed the bottom of the floor slab as being at elevation 542.08, with the finish grade outside the perimeter beginning at elevation 541.88.

At the bottom of the grading plan a section of floor was depicted. This diagram showed the finish floor at elevation 543.27 feet, the finish grade beneath the floor at elevation 542.08, the finish grade outside at elevation 541.88, the "bottom of footing" at elevation 535.10, and the "excavation line" at elevation 526.0, which line was marked "Top of non-frost susceptible material." Between the excavation line and the underside of the finish floor there had been traced the "existing ground line" showing its variants in elevation. The cross-section area between the excavation line and the underside of the finish floor was hatched. A note explained that the hatching denoted structural fill. It is this section of Addendum No. 2 that gives rise to the present controversy. The Government interpreted the provisions one way and the plaintiffs interpreted them another way. Hence, the issue of liability turns upon the reasonableness of the construction which plaintiffs, in the preparation of their bid, placed upon the contract specifications and drawings relating to excavation requirements.

Plaintiffs' bid was mailed from Seattle by Mr. Anderson several days before the bid-opening date. The bid as prepared and mailed was in the amount of $2,250,000. It was so submitted, however, with the intention of modifying it by telegram. This was done. Just before the bid-opening date, Mr. Anderson telegraphed a reduction of $273,000, making the final bid $1,977,000. The Government's estimate of the cost of the contract work was in the amount of $2,600,927. Nine bids were submitted, all of which were lower than the Government's estimate.

On July 3, 1952, plaintiffs wrote to defendant's resident engineer, explaining that they were starting to excavate but that there appeared to be a conflict in the requirements. On July 14, 1952, plaintiff actually began excavating. On July 18, 1952, the defendant's resident engineer advised plaintiffs that they were required to excavate the entire area within contract lines to the depth indicated as the excavation line on the section

showing on the grading plan. The plaintiffs proceeded with the excavation as directed. As a result, the cost of performance as required by the contracting officer was greater than the cost that would have been incurred in performance of the limited excavation contemplated by the plaintiffs. It is for the difference in cost of performance as required by the contracting officer and the cost of performance as anticipated by the plaintiffs that this action is brought.

There is no question whether the work involved in the present controversy was performed satisfactorily or not. Defendant makes no issue as to that. The only question is whether plaintiffs were required to perform the work under the terms of the contract or whether it was a determination by the contracting officer that additional work was required for which an equitable adjustment should be made.

When a contractor is requested to bid on a project, he must of necessity have adequate information from which to base an intelligent estimate. In this instance the information was supplied by the defendant. At the time request for bids were sent out the defendant sent along specifications, drawings, and changes. This was intended to inform prospective bidders what the project was about, what work would be required, and the necessary details from which a prospective bidder could submit an estimate. Significantly, the plot plan and the grading plan were not included with the other drawings at this time, but were to be furnished by addendum at a later date. A plot plan locates a given structure with respect to longitude and latitude. It shows where a given thing fits in with the surrounding area. A grading plan, on the other hand, raises and lowers an object according to elevation. Therefore, it is quite possible for an architect or engineer to design a structure in minute detail without regard for location or elevation. In the instant case, an arbitrary elevation of 0.00 was designated for the finish ground floor and other elevations were calculated in relation to this figure. All this information was supplied prospective bidders, with the exception of actual location and actual elevation, and they prepared their bids. Included in the information disseminated to prospective bidders were a total of four drawings that showed the large area under the floor of the fieldhouse as being "unexcavated." The plaintiffs in preparing their bid interpreted this to mean "do not dig out." As this amounted to a large area it made a substantial difference in cost whether this area was to be dug out and refilled or not. Based on this interpretation of the specifications the plaintiffs submitted their bid. However, about a week prior to the date for the opening of the bids the plot plan and the grading plan were received by the plaintiffs. The grading plan set the true elevation. A cut-away view of the grading plan, described as hatched previously, is the basis for the defendant's contention that the whole area had to be excavated and refilled with nonfrost susceptible material. This single hatched drawing, which neither expressly informed the bidders to excavate the entire area to the excavation line nor by specific wording deleted the word "unexcavated," appears at the bottom of the grading plan and is explained in a footnote. Even armed with our hindsight, it would take a most cautious and unreasonable estimator to reach the conclusion that this footnote changed the general drawings and would require excavation of the entire area. It is interesting to note that the defendant estimated the cost of this project to be $2,600,927 and that all nine contractors who submitted bids were substantially lower than this. The plaintiffs' low bid of $1,977,000 was only $12,000 lower than the next lowest bidder. This would suggest to our minds that all of the bidders were similarly misled. It is further interesting to note that although the request for bids stated that should there be any doubt as to the meaning of the specifications a clarification should be obtained before submitting any bid, not any of the nine bidders requested such a clarification. This again would

indicate that all the bidders were satisfied with their interpretation.

■ The defendant argues that the plans and specifications were clear and unambiguous, and to an extent we agree with defendant, but we reach an opposite conclusion. Although each of defendant's witnesses testified that "unexcavated" meant something other than "do not dig out" each had his own definition. The Government insists that words such as "excavate," "fill," and "backfill," are not terms of art but are broadly used in the profession. We reject this contention. The word "excavate" means to dig out or make hollow, hence the term "unexcavated" means the opposite. The defendant has completely failed in its efforts to show that this is not correct.

■ The defendant further contends that the job of a man bidding on a Government building is to give the Government what it orders, not the best that was possible to be given in the construction of the building, at the cheapest price. While we may agree with this contention by defendant, it is not apropos here. If the defendant had ordered the work, that would be one thing; but to camouflage this order in a footnote is an entirely different matter. We are of the opinion that the interpretation of the plans and specifications by the plaintiffs was reasonable under the circumstances, and that there was no need to request a clarification of these plans and specifications. This is a fact found by the commissioner and adopted by the court. There is evidence that the plaintiffs encountered the exact situation on similar construction projects for barracks in Alaska, and in those instances the extra work was covered by a change order. That is what should have been done in the instant case. In a decision by this court in a case similar to the instant one, where a dispute arose from the interpretation of the excavation provisions of the contract, we stated:

"* * * Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and rea-

sonably so construes them, justice and equity require that that construction be adopted. Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it. This rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions." Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418.

Although this rule pertains to the interpretation of written words in a contract, this court is of the opinion that the principle involved is dispositive of the present controversy.

■ We come now to the measure of damages. The Government makes a strenuous attack on the findings of the commissioner below, and on one point we agree with the Government. In plaintiffs' estimate of what the work would have cost had they been permitted to do the work in the manner they had planned, there was an item of "fill around outside of building." They estimated that 6,229 cubic yards of material would have been required, at 85 cents per cubic yard. However, their estimate of the cost of actual performance shows 6,299 cubic yards costing $2 per cubic yard. As stated previously, we can see no reason why the fill outside the building lines when actually performed should exceed the 85 cents per cubic yard as estimated originally. Nor does it make any difference whether the yardage is 6,299 or 6,229, since plaintiffs were obligated under the contract to perform this portion of the work. Thus, if the item on the estimate of costs of fill, had the work been performed in the manner plaintiffs contend and the estimate of work actually performed on fill were both eliminated, as they should be, the result would be a difference of $60,849.50, which plaintiffs are entitled to recover.

The Government further resists plaintiffs' demand for damages by insisting that they be cut in half because they contend that plaintiffs intended to completely excavate the north half of the area. The Government offers the testimony of Mr. Bingham to support this contention. It is hardly necessary to point out to the Government that Mr. Bingham was not the person in charge of the project, and when he became aware of plaintiffs' plans is irrelevant. The person that ordered the plaintiffs to excavate the entire area was Mr. White, who is now deceased.

The controversy was brought to the attention of Mr. White shortly after July 3, 1952, in the form of a letter from the plaintiffs. Therefore, any claim by the Government to reduce the number of days delay as a result of the dispute must likewise be denied. Mr. Bingham did not begin his position at the site until July 14, 1952, so he is hardly an authority as to what transpired previously.

If the plaintiffs had been permitted to perform the work in the manner they had planned the direct cost incurred would have been:

| Item | Cost |
|------|------|
| Excavation 4,669 c.y. @ $0.50 | $2,334.50 |
| Backfill 4,669 c.y. @ $2.00 | 9,338.00 |
| Structural fill 13,502 c.y. @ $2.00 | 27,004.00 |
| Total | $38,676.50 |

Set forth below is an estimate of the direct costs that were actually incurred:

| | |
|------|------|
| Excavation 26,160 c.y. @ $0.50 | $13,080.00 |
| Fill, inside bldg. lines 43,223 c.y. @ $2.00 | 86,446.00 |
| Total | $99,526.00 |

———◆———

The difference between the direct costs of performing the work as required by the contracting officer and the direct costs that would have been incurred in performing the work as planned and required was $60,849.50.

In addition, plaintiffs were delayed a total of 16.6 working days by the contracting officer's requirement. The plaintiffs were on a 6-day work week; therefore, this amounted to 18.6 calendar days. The commissioner found and the defendant agrees that $300 per calendar day is a fair measure of damages caused by the delay. This amounts to $5,580 for the 18.6 calendar days of delay.

There is no evidence from which to determine whether or not plaintiffs included a margin of profit in their estimates of direct costs. It is not established by the evidence that plaintiffs suffered a loss of profits, in addition to the loss of direct costs and overhead, as a result of the extra work and delay.

On the basis of other contracts performed by plaintiffs in Alaska about the same time, the average ratio of overhead to direct costs was 3.8 percent, which in this instance would amount to $2,312.28.

For the reasons given above, it is determined by the court that the plaintiffs should recover in the total amount of $68,741.78, and judgment will be entered in that amount.

It is so ordered.

JONES, Chief Judge, and DURFEE, MADDEN, and WHITAKER, Judges, concur.