**TUFANO CONTRACTING CORPORA-
TION and Anthony Grace & Sons,
Inc., Joint Venture**

v.

**The UNITED STATES.**

No. 53–61.

United States Court of Claims.

Feb. 18, 1966.

Sylvia D. Garland, Jamaica, N. Y., for plaintiff, David Fromson, Garden City, N. Y., attorney of record; Harold C. Fields and Fields, Zimmerman, Skodnick & Segall, Jamaica, N. Y., of counsel.

David Orlikoff, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

This action is based upon a contract entered into by plaintiffs, acting as a joint venture, and the Department of the Air Force. Plaintiffs agreed to build a 222-unit Capehart housing project at Suffolk County Air Force Base, Long Island, New York.[1] Although the Air Force had primary responsibility for the project, the Federal Housing Administration, which had insured the mortgages, also had some supervisory authority.

After construction had commenced, a dispute arose as to the necessity of installing certain "blocking."[2] Government representatives insisted that the blocking in question was required by the contract; plaintiffs asserted the contrary. Ultimately, proceeding under protest, plaintiffs complied with the demands of the Government. The present suit is for recovery of the resulting expenses.[3]

The facts can be summarized as follows:[4] The contract drawings and specifications were prepared for the Air Force by an architectural firm. The invitation for bids, issued in March 1958, had attached the contract form, including the drawings and specifications. The persons who prepared plaintiffs' bid made a study of the various documents, but none of them read the plans or specifications as requiring the blocking now in dispute. Accordingly, they gave no consideration to the possibility of installing such blocking. Plaintiffs' personnel did recognize that, in many respects, the contract called for construction which sur-

---

1. The "Capehart Act" is the popular name of the following amendment to the National Housing Act: amendment of August 11, 1955, ch. 783, title IV, § 401, 69 Stat. 635, 646–654, as amended, 12 U.S.C. §§ 1748a–1748g (1964). Also, see 42 U.S.C. §§ 1594a–1594f (1964).

   For a general description of the procedures regarding a Capehart project, see Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 457, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963).

2. "Blocking" consists of pieces of lumber, usually "2 × 4's," installed between, and at right angles to, parallel structural members, such as trusses or rafters, for the dual purpose of (a) providing added support for plywood sheathing or wallboard to be laid across the structural members and (b) providing a member to receive nails driven through the sheathing or wallboard.

3. The parties agreed to limit this stage of the case to the question of liability, reserving for subsequent proceedings determination of the amount of damages if defendant should be found liable.

4. Commissioner Robert K. McConnaughey prepared a report of findings of fact which has been of substantial assistance. The necessary findings made by the court are contained in this opinion.

passed the minimum standards of the FHA.[5]

Plaintiffs' bid was accepted, and the contract was executed in June 1958. Construction began on June 28, 1958. It had been agreed that plaintiffs would first complete three houses which would serve as models and which would permit the identification and elimination of problems that might appear. Numerous representatives of the Government were present at the worksite on a regular basis; these included Col. Kenneth Ozment, the project officer; James J. Shields of the architectural firm; and approximately 30 inspectors, largely military personnel, who were present daily to inspect the work.

Throughout July 1958, plaintiffs made rapid progress. By the early part of August, the three model houses had been framed, were being covered with plywood sheathing, and were almost ready to receive wallboard and shingles. On August 12th, Mr. Shields called to the attention of plaintiffs' superintendent the fact that the model houses did not have blocking between the rafters. Shields stated that such blocking was required and that installation of it after the sheathing had been applied would be more difficult. Plaintiffs' superintendent replied that Shields had no authority to require such blocking.

On August 13, 1958, plaintiffs wrote defendant that they did not intend to install the disputed blocking. The Air Force contracting officer responded by quoting provisions of the specifications which, according to him, required the

blocking for the attaching of (1) roof sheathing and (2) ceiling wallboard.[6] The position taken by the Government caused serious concern among plaintiffs' employees and subcontractors. Thus, plaintiffs sought either to negotiate a compromise or to obtain reversal of the decision of the contracting officer. Plaintiffs' efforts were unsuccessful.

On August 20, 1958, the contracting officer notified plaintiffs that he would not approve for payment any wallboard placed on ceilings without blocking. The prospect of a suspension of payments caused plaintiffs to begin installing the blocking. However, in a letter dated September 4, 1958, plaintiffs made clear that their compliance with the Government's instruction was being done under protest. Also, plaintiffs requested the contracting officer to rescind his prior decision. This request was denied on October 13th, and plaintiffs were told that they could appeal to the head of the department. After denying the claim of plaintiffs, the contracting officer informed the FHA of the dispute. The FHA replied, on December 29, 1958, that the contracting officer's interpretation of the specifications appeared to be "logical and reasonable."

In November 1958, pursuant to the disputes clause of the contract, plaintiffs submitted a formal appeal to the Air Force. Subsequently, a hearing was conducted before the Armed Services Board of Contract Appeals. Having determined, in essence, that it lacked jurisdiction over the matter, the Board dismissed plaintiffs' appeal.[7]

---

5. "Minimum Property Requirements," published by the FHA, set forth the minimum construction requirements on residential property proposed to be offered to the FHA as security for an insured mortgage loan. This publication did not specifically require any of the blocking in dispute here. Instead, in appendix C, it referred to publications of manufacturers which included recommendations as to the application of wallboard and plywood sheathing. None of the manufacturers' recommendations referred to required the disputed blocking.

6. The relevant sections of the specifications are discussed, *infra*.
   It should be noted that, regarding blocking at other parts of the houses, there was no controversy.

7. The Board was of the opinion that the power to decide the dispute belonged to the Federal Housing Commissioner and that, even if the Commissioner's letter of December 29, 1958, did not constitute an actual decision, the Board was without jurisdiction.

Work under the contract was completed by February 15, 1960. As indicated above, plaintiffs now seek to recover the extra costs resulting from installation of the disputed blocking.

It should be noted, at the outset, that there was no general practice, among builders in the Long Island area, of utilizing blocking of the type in question. That is, absent an express direction to do so, such blocking would not be used. Defendant's contention that plaintiffs were directed to install the blocking rests solely upon the contract specifications, for it was not shown in the drawings.[8] Our primary task, therefore, is to interpret the specifications.[9] The basic issues are (1) whether the specifications did require plaintiffs to install the disputed blocking or (2) whether there was at least a sufficient indication of it so that plaintiffs were obligated, before bidding, to inquire as to the meaning of the specifications.[10] We conclude, for reasons to be explained, that both questions must be answered in the negative.

The arguments of defendant as to the ceilings and as to the roofs are based upon different contractual provisions.[11] With respect to the ceilings, defendant relies upon the following portion of section 13–15(C) of the specifications: " * * * All ends and edges of wallboard shall be placed only over structural members or where none exist, rigid blocking shall be installed. * * * " According to defendant, this is a clear direction to use blocking of the type which plaintiffs ultimately installed.

The wallboard was in the form of sheets measuring 4 feet by 12 feet. The term "end" refers to the short side; the term "edge," to the long. Under defendant's interpretation of section 13–15 (C), *the entire length* of each end or edge had to be attached either to a structural member (*i. e.*, a joist) or to blocking (which ran between joists at right angles). The ends of the sheets of ceiling wallboard were nailed to joists (which were located at 2-foot intervals), but, unless blocking were installed, there would not be a *continuous* surface to which to nail the edges. Defendant asserts that the persons responsible for plaintiffs' bid relied not upon the specification, but upon the recommendation of the manufacturer. As indicated previously, the manufacturer did not suggest the use of blocking.

8. Other types of blocking were indicated in the drawings. The failure to show the disputed blocking can be explained by the fact that the architect regarded it as a "field condition." Field conditions are not shown in drawings, since their precise locations are uncertain, depending upon such factors as the position of joints.

9. The issue of defendant's liability turns upon questions of contract interpretation which amount to questions of law. Cf. Wingate Constr. Co. v. United States, 164 Ct.Cl. 131, 139 (1964); Beacon Constr. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1, 3 (1963). For this reason, among others, it is understandable that defendant did not urge finality of the administrative decisions.

10. Paragraph 4 of the invitation for bids provided:
"The bidder should carefully examine the provisions of the form of Housing Contract attached hereto, including the Drawings and Specifications made a part thereof; visit the site of the housing projects; and fully inform himself as to all conditions and matters which can in any manner affect the financing of the construction and the constructing of the housing projects or their cost. Should the bidder find discrepancies in, or omissions from, such Drawings and Specifications or other documents attached hereto, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer, Suffolk County Air Force Base, New York, and obtain clarification prior to submitting a bid. Information given will be transmitted to all known interested bidders."

11. This opinion will discuss only those parts of the specifications which were relied upon in defendant's brief. During earlier stages of the controversy, representatives of the Government cited other portions, primarily those of more general nature. *E. g.*, section 13–07(A). As indicated by defendant's failure to emphasize the broader specifications, they are clearly inadequate to support the Government's position regarding the requirement of the blocking.

Plaintiffs, on the other hand, reject the assertion that they failed to consider section 13–15(C). According to plaintiffs, that section does not constitute an instruction to use blocking at all edges of ceiling wallboard. After the controversy arose, plaintiffs took the position that section 13–15(C) was satisfied by the normal process of placing the wallboard sheets across and nailing them to the joists. Plaintiffs assert that the specification called for blocking *only in exceptional cases, e. g.,* when the wallboard extended beyond the end of the building in such manner that no structural members were present.

█ It is unnecessary to elaborate further on the contentions of the respective parties. Although defendant's interpretation of section 13–15(C) is a reasonable one, we cannot accept defendant's view that the specification is unambiguous. Because use of such blocking was not customary in the trade, it was incumbent upon the architect to state the requirement with clarity, and we agree with plaintiffs that section 13–15(C) was not sufficiently clear. It is interesting to note the contrast between this section and others which were quite explicit regarding the need for blocking. An example of the latter type is section 13–09 (A) (pertaining to wood subfloors) which provided, in part, as follows: " * * * blocking shall be installed under all plywood joints at right angles to joists." Similar language could have been used to spell out the requirement for blocking at joints of the ceiling wallboard, but this was not done.

Also significant is the fact that section 13–15(C) applied to walls as well as to ceilings. When blocking was required with respect to the walls, clear instructions were given. Section 13–07(B) contained a number of express references to blocking including the following: " * * * All stud partitions and walls shall be provided with one row of 2" x 4" blocking, cut in between studs and set halfway between floor and ceiling." The absence of a similar direction regarding block-ing between joists is a factor which supports plaintiffs' position.

█ The factual situation of the present case is not that of a contractor who, prior to submitting his bid, discovered an ambiguity in the specifications. We have found, rather, that none of the persons who took part in the preparation of plaintiffs' bid gave any consideration to the possibility that the blocking now in dispute was required by the specifications. In view of the circumstances described above, we find that plaintiffs' personnel acted reasonably. Accordingly, it follows that plaintiffs cannot be charged with violation of any duty to seek clarification before bidding.

As stated above, we have rejected defendant's contention that section 13–15 (C) represented an unambiguous direction to provide the blocking. The various arguments of plaintiffs are reasonable, and it is proper, therefore, to apply the rule that such problems of interpretation are to be resolved against the Government, the party responsible for furnishing the specifications. Cf. Wingate Constr. Co. v. United States, 164 Ct.Cl. at 136, and cases cited there. Regardless of the intention of the architects, the specifications were not sufficiently clear to warrant acceptance of the Government's position as to liability. With respect to the matter of blocking in the ceilings, we hold that plaintiffs are entitled to recover.

█ In asserting that blocking was required to support the plywood sheathing of the roof, defendant relies upon two sections of the specifications. The first is section 13–07(E)(a) which provides, in part, as follows:

> * * * Roofs in general shall be supported on roof trusses spaced generally 2 feet apart. * * * Provide * * * any blocking required for the attachment of roof sheathing or ceiling wall board. * * *

Defendant observes that this section calls attention to the fact that blocking is required with respect to the sheathing of the roof. The view of plaintiffs is that

section 13–07(E)(a) could not be interpreted as a direction to install the disputed blocking throughout the construction (*i. e.*, between all trusses including those at 2-foot intervals). According to plaintiffs, this specification called for blocking *only* in those instances where the trusses were spaced more than 2 feet apart. We consider that, in light of the trade practice, plaintiffs' interpretation is a reasonable one. Section 13–07(E)(a) is not in itself adequate to support a finding that the disputed blocking was required.

■ The other provision cited by defendant is 13–08(A)(c) which states:

Roof sheathing shall be 5⁄16 inch plywood for rafter spacing 16 inches on centers [*i. e.*, 16 inches apart] and ⅜″ for rafter or wood trusses spaced not over 24 inches on centers. Plywood will be installed with grain of outer plys across rafters, nailed with six (6) penny commons spaced not over six (6) inches on center at all edges and twelve (12) inches on center at each intermediate rafter. * * *

According to defendant, this section made it apparent that blocking was to be installed under the edges of the sheathing, since, otherwise, there would be no point in requiring the spacing of nails 6 inches apart "at all edges." The ends of the plywood sheets lay along rafters, but, unless blocking were installed under the edges (the longer sides of the plywood sheets), there would be nothing to receive nails spaced "at all edges." Defendant argues that plaintiffs ignored the nailing requirement imposed by section 13–08(A)(c) and that, if plaintiffs had thought there was some inconsistency, they should have inquired before bidding.

In answer to defendant's view, plaintiffs point out that section 13–08(A)(c)

is essentially a nailing schedule and that it does not mention blocking. Moreover, plaintiffs interpret the directions as to nailing in a manner very different from defendant.[12]

In our discussion of the ceilings, we emphasized the contrast between the section relied upon by the Government and other provisions which were explicit in requiring blocking. With respect to the roofs, the contrast is even greater. If the Government had wished to have either a rafter or blocking under all joints of the plywood sheets, it should have said so in readily understandable language. Certainly, the specifications in question do not meet this standard. Cf. Anderson Constr. Co. v. United States, 289 F.2d 809, 153 Ct.Cl. 475, 480 (1961).

■ Furthermore, we agree with plaintiffs that they had no duty to inquire about the possibility of blocking to support the sheathing. In asserting that plaintiffs were bound to seek clarification, defendant cites Beacon Constr. Co. v. United States, supra footnote 9. *Beacon Constr. Co.* is materially distinguishable from the present case, for it involved a discrepancy in specifications which was "patent and glaring." 314 F.2d 501, 161 Ct.Cl. at 7. Moreover, the ambiguity had been discovered by Beacon Construction Company prior to the computation of its bid. With respect to the present case, it cannot be said that there was an obvious discrepancy as to blocking in the roofs. Any ambiguity which did exist was at best obscure in nature. Plaintiffs failed to discover the matter before bidding, and, under the circumstances, their failure was both justifiable and reasonable.

To summarize, we have rejected each of the Government's major contentions and have found that, regarding both the ceilings and the roofs, the view of plaintiffs must prevail. As indicated previously, the proceedings conducted thus

---

12. Plaintiffs used ⅜-inch plywood sheathing. Accordingly, the trusses or rafters were spaced at 24-inch intervals. The plywood sheets were 4 feet by 8 feet. Under plaintiffs' reading of section 13–08(A)(c), the requirement of nails at 6-inch

intervals applied to the 4-foot ends of the sheathing and that for nails 12-inches apart applied to the rafters underlying the sheets at places other than the ends, *i. e.*, "intermediate rafters."

far were limited, by agreement of the parties, to the question of liability. Accordingly, the amount of plaintiffs' recovery will be determined in proceedings pursuant to Rule 47(c).

With regard to the matter of the theory of recovery, plaintiffs assert that defendant committed a breach of contract, *i. e.,* that defendant's actions, in demanding the blocking, went beyond the scope of the contract. Defendant (in addition to denying any liability whatsoever) takes the position that this question is not ready for determination. Defendant points out that, in deciding whether a change was a cardinal one (constituting a breach of contract), an important element is the amount of costs resulting from the change. Cf. Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557, 561 (1961). In view of the present nature of the record, we agree with defendant that determination of this issue, whether there was a breach of contract, should be deferred. This matter can best be decided after plaintiffs have shown what effects installation of the blocking had upon their operations and what it meant in terms of time and money.