**A. R. F. PRODUCTS, INC.**
v.
**The UNITED STATES.**
No. 3–66.

United States Court of Claims.
Dec. 15, 1967.

Marshall A. Burmeister, Chicago, Ill., attorney of record, for plaintiff.

Ann Bowen, Washington, D. C., with whom, was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. Mary M. Schroeder, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Richard Arens with directions to file a report and recommended conclusion of law on defendant's motion and plaintiff's cross-motion for summary judgment. The commissioner has done so in an opinion and report filed on March 30, 1967. Plaintiff filed a request for review of the commissioner's opinion and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties filed before the commissioner. Since the court agrees with the commissioner's opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied and plaintiff's petition is dismissed.

OPINION OF COMMISSIONER *

ARENS, Commissioner:

This is a suit to recover extra costs arising out of an alleged change in the

---

* The opinion and recommended conclusion of law are submitted pursuant to order of the court under Rule 54(b). The necessary facts are stated in the opinion.

requirements of a contract entered into by plaintiff with the United States Air Force to supply radio antenna couplers which are instruments designed to connect one antenna with several transmitters or receivers. Plaintiff alleges that the decision of the Armed Services Board of Contract Appeals denying its appeal under the disputes article of the contract from the action of the contracting officer refusing an increase in contract price, is not supported by substantial evidence and is erroneous as a matter of law.[1] The case is before the court on cross-motions for summary judgment.

On March 19, 1958, the United States Air Force issued a letter requesting technical proposals for an anticipated procurement of antenna couplers which were to be built in accordance with certain attached exhibits. The letter stated that the procurement would be accomplished in two phases: first, submission and evaluation of technical proposals, without pricing, to determine acceptability of the products offered, and second, issuance of an invitation for bids only to those firms having acceptable proposals.

Attachment "A" provided, among other things, that the technical proposals should give special emphasis on several requirements, including the mechanical configuration of the tuning mechanism; and that there should be a statement of the principles which might be applied in the solution of certain problems and methods, and that this was "particularly important with respect to the tuning mechanism * * *." The specifications which were attached to the letter requesting the technical proposals provided that "Each channel shall be manually tuned by a single control on the front panel of the antenna coupler * * *."

On March 27, 1958, plaintiff's representatives attended an Air Force brief-

ing during which the Government engineers stated that "single knob"[2] tuning of the antenna couplers was desired by the Government, but that the Government engineers were not certain that all of the performance requirements could be realized without additional separate fine tuning knobs, called "trimming adjustment," and that if the performance requirements could not be realized with single knob tuning, then trimming adjustments would be required. At the time of the briefing no known antenna couplers had been successfully built with single knob tuning.

In April 1958, plaintiff, a firm with long experience in research and development of electronic equipment in the field of communication, radar and navigation, submitted its technical proposal which described an antenna coupler using only single knob tuning without trimming adjustments. The proposal included, under the heading, "Degree of Success Expected on Each Requirement Paragraph of the Exhibit":

> Para. 3.4.4. Frequency Range: The coupler is expected to cover the frequency range plus overlap as specified. The possibility of gang tuning with single control is marginal. See Para. 6.7. There is a fair-to-good possibility of having the 0.5 MC accuracy if the ganging is successful. Resetability appears achievable with control of tolerances of the leadscrew assembly. We believe this is possible.

At the hearing which was conducted by the ASBCA, plaintiff's executive vice president, in charge of research and development, testified that at the time plaintiff submitted its technical proposal, it was plaintiff's "belief that the Government desired a coupler affording single-knob control," and that plaintiff "believed that there was an excellent possibility that we could furnish this." He further testified that the only reser-

1. ASBCA No. 7171, dated October 26, 1962.

2. The terms "single knob tuning," "gang tuning" and "automatic tracking" are interchangeable.

vation plaintiff had related to uncertainty that the coupler could then meet all the other performance requirements.

On July 28, 1958, the contract, with a total contract price of $80,334, was awarded to plaintiff on the basis of the bid which plaintiff had submitted on June 13,. 1958, in accordance with its technical proposal. The technical proposal was incorporated as part of the contract, but the contract provided that in the case of conflict between the technical proposal and the specifications, the latter would govern.

Over the course of the ensuing several months, plaintiff encountered a number of design and engineering problems in attempting to develop antenna couplers which would meet the performance requirements with single knob tuning. After failure in its initial efforts, plaintiff finally, by the latter part of April 1959, was convinced that it could produce such antenna couplers. On April 28, 1959, plaintiff submitted to defendant Engineering Change Proposal No. 1 for which it requested a $25,000 increase in the contract price. This proposal included the following:

4. NATURE OF CHANGES.

4.1 It is proposed that the following changes be made in Exhibit—RADC—2561 dated 7 June 1957 and Amendment No. 1 to RADC—2561 dated 24 March 1958.

4.2 Add the following to Par. 3.4.4.1 of the Exhibit: "Provision shall be made for electrical and/or mechanical tracking of the resonators of each filter; such that trimming adjustments are not required during normal use of the coupler switch sources and loads as specified in Par. 3.2".

4.3 Change Par. 3.4.4.1.2 of the Exhibit to read: "The dial calibration shall be accurate within ± 1.0 MC of the center of the response curve of the corresponding filter.

4.4 Modify Par. 3.3.1 of the exhibit by inserting after the third sentence "—shaped probes" the following: "The probes shall be positioned and shaped so that optimum coupling is achieved at each frequency without movement of any or all of the probes with operating conditions specified in Par. 3.2. The probes shall be securely fixed in place".

On May 14, 1959, defendant issued a Notice to Show Cause why the contract should not be terminated for failure to meet delivery schedules. Thereafter, the parties conferred concerning termination of the contract for default and the contents of Engineering Change Proposal No. 1. After it was concluded that the delivery schedule would be extended, plaintiff wrote:

We should like to request that you confirm to us in writing our understanding of the decision taken by the government that, should the models include any of the suggested changes incorporated in ECP No. 1, such changes would not be used as grounds by the government for rejection of the equipment so long as such changes did not affect the satisfactory compliance of the equipment with all of the requirements.

Defendant replied that it was in agreement with plaintiff, but emphasized its reliance on the language, " * * * so long as such changes did not affect the satisfactory compliance of the equipment with all of the requirements." Within the next few months plaintiff was successful in producing antenna couplers with single knob tuning which met the performance requirements of the contract, and thereafter plaintiff completed the contract.

On November 3, 1959, plaintiff submitted to defendant another engineering change proposal which again contained a provision for "automatic tracking [single knob tuning] * * . * to eliminate the necessity for separate front panel trimming adjustment * * .*." On January 7, 1960, defendant advised plaintiff that the proposal was "not acceptable to the Air Force because the proposed change is not a 'change' but

merely the contractor's approach to meeting the specification." On December 27, 1960, the contracting officer issued his findings and decision denying plaintiff's request for an increase in contract price to cover an alleged increase in costs incurred in the performance of the contract. The contracting officer found that plaintiff's engineering change proposal of April 28, 1959, had never been approved and that plaintiff's engineering change proposal of November 3, 1959, had been rejected, and that the features of the proposed engineering changes used by plaintiff represented an approach only to the problem of fabrication and were used by plaintiff for its convenience and in no manner constituted a change which would be the basis for an adjustment in contract price.

Plaintiff perfected a timely appeal to the ASBCA which, as heretofore indicated, after a hearing, denied plaintiff's appeal. It was plaintiff's contention before the Board that the specifications did not, as defendant contended, limit the tuning to single knob tuning, but permitted the use of the separate fine tuning knobs called trimming adjustments. The Board noted (1) the provisions of the specifications which provided that each channel shall be manually tuned by a single control, (2) the language in plaintiff's technical proposal which described an antenna coupler using only single knob control and (3) the fact that plaintiff knew that the Government desired single knob tuning. The Board stated that it did not find the ambiguity in the specifications to justify a consideration of the testimony (which it regarded to be of questionable weight) that prior to the preparation of the technical proposal, Government representatives said that if performance requirements could not be realized with single knob tuning, then trimming adjustments would be required. Nor did the Board find ambiguity, as suggested by plaintiff, in the words of the technical proposal that the possibility of gang tuning was marginal. The Board stated that these words "must be interpreted in the light of the circumstances in which they were introduced into the instrument"; and that they were so introduced in the initial phase of the procurement and in answer to the Government's direct inquiry concerning the degree of success to be expected on each requirement; and that they found their way into the contract only because the proposal was incorporated into it, but with the proviso that in case of conflict the specification should govern. Finally, the Board observed that there was nothing significant in the fact that in the initial procurement phase there may have been doubt concerning the feasibility of single knob control; and that difficulties are inherent in the nature of new development.

It is clear that the Board's findings of fact are amply supported by the evidence and that the Board's interpretation of the contract documents is correct as a matter of law.

 It is, of course, the avowed purpose and primary function of the court in contract cases to ascertain the intention of the parties. Williston on Contracts, Third Edition, section 601 (1961). In ascertaining this intention, the court gives great, if not controlling, weight to the interpretation placed by the parties themselves upon the contract as evidenced by their statements and conduct prior to the time when the contract becomes the subject of controversy. Chase & Rice, Inc. v. United States, 354 F.2d 318, 173 Ct.Cl. 740 (1965); Blanchard v. United States, 347 F.2d 268, 171 Ct.Cl. 559 (1965). In the instant case, the plain language of the contract documents called for antenna couplers with single knob control and the parties interpreted this language to mean *only* single knob control, without the additional separate tuning knobs called trimming adjustments. Moreover, since the language of the contract is not susceptible to an intelligent meaning other than that which was given to it by the parties, the line of cases which holds that an ambiguous contract susceptible of several possible meanings must be construed against the party

which drew it, has no applicability to the present situation Keco Industries, Inc. v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967).

 The fact that neither party knew for a certainty that antenna couplers with single knob control could be produced which would meet the performance requirements did not mean that this was not the objective which was prescribed and intended. The statement by the Government engineers that if the performance requirements could not be realized with single knob tuning, then trimming adjustments would be required, could only be regarded as an announcement of a probable proposed change, depending upon an event which did not occur. There is, moreover, no showing that the Government engineers who made the above statement were authorized to bind defendant to waive a contract right of the Government. Penn-Ohio Steel Corp. v. United States, 354 F.2d 254, 173 Ct.Cl. 1064 (1965). But this becomes moot in face of the fact that, notwithstanding the difficulties encountered by plaintiff, it did produce the antenna couplers with single knob control which did meet the performance requirements. It is well established that a contractor is not entitled to recover from the Government on a mere showing that it incurred unanticipated costs, unless there was fault on the part of the Government. Rolin v. United States, 160 F.Supp. 264, 142 Ct.Cl. 73 (1958).

Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953), cited by plaintiff is inapposite. In that case this court reiterated the familiar principle that the Government may be held liable for a contractor's losses resulting directly from faulty specifications which the Government has promulgated. There is in the instant case no such showing.

It is, accordingly, recommended that defendant's motion for summary judgment be granted, that plaintiff's motion for summary judgment be denied, and that plaintiff's petition be dismissed.

COLLINS, J., took no part in the decision of this case.