**D & L CONSTRUCTION CO. & ASSOCIATES**

v.

**The UNITED STATES.**

No. 159–65.

United States Court of Claims.
Nov. 15, 1968.

Joel C. Wise, Washington, D. C., attorney of record, for plaintiff.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Richard Arens with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on February 28, 1968, wherein such facts as are necessary to the opinion are set forth. Defendant excepted to that portion of the commissioner's report which states that plaintiff is entitled to recover on Claim 4, "Closing of Access Roads", but took no exception to the remaining portions of the opinion covering Claims 1 through 3. No exceptions were filed by plaintiff and the case has been submitted to the court on defendant's brief and oral argument of counsel. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover on Claims 2 and 3, and as to them the petition is dismissed; plaintiff is entitled to recover extra compensation under the changes provisions of the contract on Claim 1 and as to it proceedings are suspended so that the parties can return to the Armed Services Board of Contract Appeals for determination of the amount due (with plaintiff to advise the court at intervals of not more than 60 days beginning with the date of this opinion of the status of the case before the Board pursuant to General Order of April 1, 1968, implementing Rule 100); and, that plaintiff is entitled to recover in this court on Claim 4, with judgment thereon entered for plaintiff and the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

ARENS, Commissioner: This case arises out of a contract entered into on June 23, 1959, by plaintiff, a joint venture, with the Department of the Army for the construction of a 251 unit Capehart Housing Project at White Sands Missile Range, New Mexico. In this court, plaintiff, relying exclusively upon the administrative record, challenges by way of an assignment of errors decisions by the Armed Services Board of Contract Appeals denying three appeals from adverse decisions by the contracting officer.[1]

Upon the basis of a stipulation entered into by the parties, plaintiff also seeks in this court damages on a breach of contract theory due to alleged delays as a result of the closing of access roads to the project site.

### Claim 1—Foundations, Footings and Stem Walls [2]

The project was divided into two areas, one designed for housing commissioned officers, and the other for non-

---

1. The administrative procedures were pursued under contract changes and disputes provisions usually found in Capehart Housing contracts.

2. ASBCA No. 8170 dated October 16, 1963. (1963 BCA ¶ 3887)

commissioned officers. This claim concerns only the latter area containing 215 units.

The houses were to be built on concrete slabs laid over flat, compacted earth pads. The structural drawings, entitled "Structural—Foundation Plan and Details," disclosed that as a general rule the finished grade lines were to be a uniform 8″ below floor level. Section 1, subparagraph 1–11 of the specifications required grading of "the surfaces within 5 feet of the building in a manner satisfactory to the Contracting Officer, to the contours shown on the drawings." The grading and drainage drawings showed varying finished ground elevations by contour lines which intersected the actual sides of the buildings.[3]

Plaintiff interpreted the contract documents as generally providing for construction of houses with a uniform 8″ stem wall and a 1′ 6″ footing, and submitted its bid on this basis which would enable it to use a standard form for pouring stem walls and foundations. It was not until after plaintiff had completed the foundation on several houses that plaintiff was shown by defendant individual drawings for each house, which depicted detailed elevations of ground levels at various points around the perimeter of the house, and was required by defendant to tailor the stem walls and foundations of each individual

house, to varying heights. This involved a more costly operation than plaintiff had contemplated and plaintiff asserted that it constituted a change for which extra compensation should be granted. Plaintiff's project manager, Mr. Hazeltine testified, in the words of the ASBCA, as follows:

Mr. Hazeltine stated that in estimating the contract requirements he used the plans and specifications and based the estimate for concrete on a uniform footing depth of 1′ 6″ below the finished grade and considered the finished grade to be a uniform 8″ below the level of the floor. He did consider the contour lines on the Grading and Drainage plans and noted that they came to the perimeter of the houses but did not consider there was a conflict between the structural details, the Grading and Drainage plans and the specifications. He did not believe the contours were really intended to come to the perimeter of the buildings but only to the edge of the pads some five feet out, as this was the general practice and had been his past experience. The appellant did not intend to completely ignore the Drainage and Grading plans and the contours shown thereon, but intended to use a uniform 8″ stem wall and wrap the flat pad into the contours five feet out from the building,

---

3. General provisions 2(c) provided:

"In any case of discrepancy, either in the figures, in the Drawings, or in the Specifications, the matter shall promptly be submitted to the Contracting Officer, who shall promptly obtain a determination in writing from the Commissioner. In case of difference between drawings and specifications, the specifications shall govern. Any adjustment by the eligible builder without such determination shall be at his own risk and expense. Omissions from the Drawings or Specifications or misdescription of details of work which are manifestly necessary to carry out the intent of the Drawings and Specifications, or which are customarily performed, shall not relieve the eligible builder from performing such omitted or misdescribed details of work, but they shall be performed as if fully and correctly set forth and described in the Drawings and Specifications. The eligible builder shall check all Drawings and Specifications furnished him immediately upon receipt and shall promptly notify the Contracting Officer of any discrepancies. The eligible builder shall compare all Drawings and verify the figures before laying out the work and will be responsible for any errors which might have been avoided thereby when measurements are affected by conditions already established, the eligible builder shall take measurements notwithstanding the giving of scale or figure dimensions in the Drawings. Deviations from the Drawings and the dimensions therein given, whether or not error is believed to exist, shall be made only after written authority is obtained from the Contracting Officer and the Commissioner."

as this was the usual practice. Mr. Hazeltine stated that although he recognized there were instances where deeper footings would be required due to the contract requirement that the footings of a house would all be either in natural ground or fill, he still estimated the concrete requirement on the basis of a uniform footing.

Although there was conflict in the expert testimony as to whether contours are practicable in depicting finished grades, the ASBCA stated that it was especially impressed by the Government's expert witness on contours, who explained and illustrated the use of contours in establishing finished grades and the simplicity of applying the typical drainage pattern to arrive at a comparatively accurate finished grade elevation at different points around the perimeter of a house. In denying plaintiff's appeal, the ASBCA found that:

1. While there were admitted inconsistencies between the structural drawings and the grading and drainage plans and specifications, plaintiff knew of these inconsistencies at the time of bidding but chose to ignore them in view of its past experience; and that it was incumbent upon a bidder to seek clarification of an ambiguity before bidding;

2. When considered as a whole, the contract required the grading to contours around the perimeter of the houses and that this definitely precluded any possibility of uniform 8″ stem wall or uniform footings;

3. Representation by contours was one of the acceptable methods of showing finished grades and the original drawings furnished by the Government were adequate for this purpose;

4. The individual drawings for each house showing detailed elevations of ground levels at various points around the perimeter of the house and revised grading and drainage plans were no more than an enlargement of details available to plaintiff on the original drawings if it had taken the time necessary to glean the information; and

5. Plaintiff either failed to understand or chose to ignore Section 1, subparagraph 1–11 of the specifications (previously alluded to in this opinion) and the fact that the contours on the drainage and grading plans ran to the perimeter of the houses and thereby established the finished ground elevations around the perimeter of the house.

In considering plaintiff's motion for reconsideration of its decision, the ASBCA further stated that plaintiff ignored the provisions of the contract which provided that in case of difference between drawings and specifications, the specifications shall govern; that plaintiff overlooked the provisions of the contract which read "Omissions from the Drawings or Specifications or misdescription of details of work which are manifestly necessary to carry out the intent of the Drawings and Specifications, or which are customarily performed, shall not relieve the eligible builder from performing such omitted or misdescribed work, but they shall be performed as if fully and correctly set forth and Described in the Drawings and Specifications"; and that, although the Government conceded that it was at fault in failing to make all the drawing details correlate precisely, plaintiff failed to believe that the Government intended the result of its Grandfather clauses in the specification which provided for finished grade everywhere to the contours shown on the drawings.

In resolving the question presented by this claim, we start with the proposition that although the ultimate issue involves an interpretation of the contract documents, which is a question of law concerning which the ASBCA decision is not entitled to finality under the Wunderlich Act, the underlying factual determinations are entitled to finality if substantially supported. Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 181 Ct.Cl. 607 (1967); Williamsburg Drapery Co. v. United States, 369 F.2d 729, 177 Ct.Cl. 776 (1966). With this in mind, and under the guidance of the decisions of this court, it is

concluded that the ASBCA failed to give appropriate weight to certain relevant uncontradicted evidence, and made factual determinations not supported by substantial evidence; and further that the ASBCA interpretation of the contract documents is erroneous as a matter of law.

From the record as a whole we derive a view of plaintiff, not in retrospect, but within the actual factual environment as of the time of the preparation of its bid, as it studied the many contract documents, including numerous drawings and specifications with literally thousands upon thousands of details involved in a sizable construction project. Micrecord Corp. v. United States, 361 F.2d 1000, 176 Ct.Cl. 46 (1966). Plaintiff had extensive experience in constructing mass-produced housing, including several Capehart Housing projects in which there had been a generally consistent pattern, of uniform foundations, footings and stem walls. This experience, under somewhat similar contracts, may be considered in determining the reasonableness of plaintiff's interpretation of the contract documents. Abe L. Greenberg Co. v. United States, 300 F.2d 443, 156 Ct.Cl. 434 (1962).

There can be little doubt that the *structual* drawings, read together with those specifications which called for a grading within 5 feet of each building to the contours, pointed to the interpretation which plaintiff made, namely, that there was to be a uniform footing depth. Plaintiff noted the contours which appeared in the *grading* and *drainage* drawings which actually extended not just to the edge of the 5 foot pad but to the perimeter of the houses. Plaintiff, did not consider a conflict existed, however, but believed that the contours on the *grading* and *drainage* drawings were intended to come only to the edge of the pads and not to the perimeter of the houses "as this was the general practice" and had been its past experience. The record establishes that these *grading*

and *drainage* drawings were reduced to one-half the original scale and that one inch depicted 50 feet. Thus, the contour lines which ran to the several houses portrayed on the *grading* and *drainage* drawings actually extended only one-tenth inch more than plaintiff thought was intended. It is to be emphasized that the drawings on which the contours appeared were for the stated purpose of depicting the *grading* and *drainage*, while the drawings upon which plaintiff principally relied in reaching its interpretation, were for the stated purpose of depicting the *structure and foundation*. At the time plaintiff submitted its bid, moreover, it had not been furnished by defendant with the individual drawings for each house, which showed the detailed elevations. The evidence before the ASBCA revealed also that the original drawings did not include certain steps and stoops which were later added in order for the houses to be usable; that the grading plans did not meet the Federal Housing Administration minimum property standards and that it became necessary to obtain a waiver of FHA standards to complete the grading;[4] and that plaintiff's interpretation of the contract requirements was consistent with a balanced cut and fill of the dirt on the project, which is customarily sought in such construction projects, but that plaintiff was actually required to remove a large surplus of earth.

Was it incumbent upon plaintiff to seek the clarification prescribed in the general provisions of the contract? Under the circumstances of this case, it is clear that the "admitted inconsistencies" were not so gross and patent as to constitute adequate warning to plaintiff that it was obliged to submit them to the contracting officer for his determination. L. Rosenman Corp. v. United States, 390 F.2d 711, 182 Ct.Cl. 586 (1968); Thompson Ramo Wooldridge Inc. v. United States, 361 F.2d 222, 175 Ct.Cl. 527 (1966); Tufano Contracting Corp. v. United States, 356 F.2d 535, 174

---

4. FHA insured the construction loan, and plans for the project had to be approved by it.

Ct.Cl. 398 (1966); Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 171 Ct.Cl. 478 (1965).

We consider then whether plaintiff's interpretation was "within the zone of reasonableness" referred to in WPC Enterprises Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963). Perhaps in retrospect, with the missing drawings supplied, and with full explanation of defendant's intended use of the contours, previously obscurely ·manifested, one could question the reasonableness of plaintiff's interpretation and plaintiff's corresponding failure to comprehend the significance of the not too evident inconsistencies; but plaintiff was not expected to exercise clairvoyance. *Blount Bros. Constr. Co.*, supra. Under the circumstances as revealed by the entire record in the case, plaintiff's interpretation was certainly a reasonable one, and, therefore, under familiar principles of contract interpretation its interpretation rather than that of the defendant-drafter of the language must be adopted. Blanchard v. United States, 347 F.2d 268, 171 Ct.Cl. 559 (1965); Bennett v. United States, 371 F.2d 859, 178 Ct.Cl. 61 (1967). Plaintiff is accordingly, entitled to extra compensation under the changes provisions of the contract.

### Claim 2—Kitchen Walls [5]

Plaintiff contended before the ASBCA that the contract documents did not provide for the plastering, but only for the painting of the masonry wall (separating the kitchen from the carport) in each of certain kitchen units, and that the plastering of the walls, which it was required by defendant to perform in addition to the painting thereof, constituted extra work for which it was entitled to compensation.

The specifications provided that plaster was to be applied in accordance with the Room Finish Schedule which, in turn, provided that Portland Cement plaster and one-half inch Gypsum wallboard were for use on kitchen walls. The specifications further provided that the Gypsum wallboard was to be applied only to wood-framed walls. Since the masonry walls in question were not wood-framed, the Gypsum wallboard was obviously not to be applied.

In support of its interpretation that the walls were to be painted instead of plastered and painted, plaintiff relies upon the door detail drawings which showed that the type BB metal door frame (which was to be used in the walls in question) were to be used where the finished wall was exposed masonry block. Plaintiff also relies on a provision in the specifications, entitled "Concrete and masonry surfaces" which provided that "Concrete masonry units exposed in kitchen, bathroom or shower areas shall be filled with a cement-latex filler." Plaintiff then argues that the Room Finish Schedule, which indicated by use of dots certain finishes to be used at indicated places, did not negate an exposed concrete block wall.

The ASBCA found, and plaintiff has not here denied, that in estimating the quantities of plaster for purposes of bidding on the job plaintiff "recognized that with respect to plastering the kitchen wall there was a conflict between the Room Finish Schedule and the interpretation that it gave to the large scale drawings of the type BB door frame," but that plaintiff "raised no question at that time and chose to ignore the Room Finish Schedule in favor of the door frame drawings."

In denying the appeal, the ASBCA stated at p. 19,295:

> Reading the contract as a whole and taking into consideration standard construction practices the Board is convinced that the easily recognizable intent was that plaster be applied to concrete masonry and gypsum board to wood framed interior walls.

> The Board experiences no difficulty in finding that the contract required the plastering of the subject walls and

---

5. ASBCA No. 7673 dated October 16, 1963. (1963 BCA ¶ 3887).

that the large scale drawing of the BB door frame was for the purpose of furnishing detailed information as to dimensions and method of securing the door frame to the wall and had nothing to do with the finish to be applied to the wall contiguous to the door frame.

■ Unlike the contract provisions pertaining to the previously considered claim (Foundations, Footings and Stem Walls), the contract provisions in the instant claim do present a conflict of which plaintiff was cognizant and which were of a nature to bring into operation the general provisions of the contract [6] requiring plaintiff to submit the matter to the contracting officer for a determination. Plaintiff cannot now bridge the crevasse in its favor; i. e., plaintiff cannot rely on the principle that ambiguities in contracts written by the Government are construed against the drafter. Beacon Constr. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963); Unicon Management Corp. v. United States, 375 F.2d 804, 179 Ct.Cl. 534 (1967). In resolving the conflict between the Room Finish Schedule and the large scale drawing of the type BB door frame, one has only to refer to the contract general provisions which provided that in case of difference between the drawings and specifications, the latter shall govern.[7] A reading of the several aforementioned contract provisions together leads to the conclusion that defendant's interpretation which was adopted by the ASBCA was correct and that "the easily recognizable intent" was that plaster be applied to the walls in question. Plaintiff is, therefore, not entitled to recover on this claim. Bishop Engineering Co. v. United States, 180 Ct.Cl. 411 (1967).

### Claim 3—Roof Overhang [8]

The issue presented by this claim and the essential facts were succinctly stated in the ASBCA opinion as follows at pp. 19,295–6:

The appellant bid the job and commenced construction on the basis of the extreme outermost point of the roof overhang being 36 inches from the perimeter of the building including the fascia board and the 2 x 4 used as trim around the edge of the roof to tie in the fascia board.

After framing the first unit the appellant was stopped and required to construct all units with an approximate 40-inch overhang.

The appellant's contention that the extreme outermost edge of the roof would be 36 inches from the perimeter of the house is based on plates 36, 40, 44, 49, 53 and 59 of the plans which are roof framing plans and show two dashed lines along the outside edges of the roofs 36 inches from the perimeter of the buildings.

The appellant, however, recognized that the roof framing plans did not, and could not, show the fascia board and trim and in preparing its bid consulted plate 63 of the plans for these details and there found large scale drawings giving detailed dimensions of the roof overhang and the architectural features of the edge of the roof. These large scale plans clearly showed that the outermost edge of the roof overhang would be some 40 inches from the perimeter of the building.

\* \* \*

The appellant recognized what it termed a discrepancy between these large scale drawings and the 36-inch dimensions on the roof framing plans. However, without raising the question with the Government the appellant resolved the discrepancy in favor of the 36 inches shown on the roof framing plans.

There is much conflicting testimony as to the meaning to be attributed to the two dashed lines along the outside

6. See fn. 3 on page 992, supra.

7. See fn. 3 on page 992, supra.

8. ASBCA No. 8169 dated October 16, 1963. (1963 BCA ¶ 3887)

perimeter on the roof framing plans. After careful consideration the Board accepts the testimony of the Government's expert witness, Mr. Mecklem, as being the most logical and convincing explanation.

Mr. Mecklem testified that: "The three-foot dimension on the roof framing plans, which are structural plans, is placed there to show the point of transition between the structural plans and the structural framing system and the architectural features which are attached thereto." That the dashed lines at the end of the joists on the roof framing plans indicate that there are architectural features and members of some thickness to be fitted to the end of the joists that will extend the overhang further out and to determine what these architectural features are, it is necessary to go to the architectural details. * * * This in effect is what the appellant did but after considering the architectural details it chose to ignore the detailed dimensions set forth therein.

The appellant in effect claims a discrepancy in the plans and asks that the discrepancy be resolved in its favor.

 From the foregoing, it is apparent that this claim rests on the same type factual basis as the preceding kitchen wall claim, and should be resolved on the same legal principles. The acceptance by the ASBCA of the testimony of the Government's expert on the meaning to be attributed to the two dashed lines along the outside perimeter on the roof framing plans cannot, under familiar precedents, be disturbed. River Constr. Corp. v. United States, 159 Ct. Cl. 254 (1962). It is clear that the ASBCA interpretation is correct, and that plaintiff is, therefore, not entitled to recover on this claim.

### Claim 4—Closing of Access Roads

The contract documents contained a small vicinity map which depicted the main roads in the vicinity of the White Sands Missile Range. The contract provided that defendant would make available to plaintiff existing off-site improvements, such as existing streets, and that plaintiff was to use only established roadways, or construct and use such temporary roadways as were authorized by the contracting officer.

At the time plaintiff made its physical examination of the project site, there were three principal access roads by which the site could be reached from outside points. One road was from Las Cruces, New Mexico, through Organ, New Mexico, thence to the project. One road was from Alamogordo, New Mexico, to Organ, New Mexico, then to the project. One road went directly from El Paso, Texas, to the project site. There was a fourth road to the project, known as the Oro Grande Road, but it was little used by people traveling from El Paso or Las Cruces because it was circuitous and poorly maintained.

On June 23, 1959, the date the contract was executed, the contracting officer sent a letter to the Field Office Director of the Federal Housing Administration, with copy to plaintiff, which read as follows:

This is to assure you that the United States of America the Department of Defense and White Sands Missile Range, New Mexico, will provide suitable access and means of ingress and egress to and from the subject project to the public road or highway both during the construction period and thereafter for such period of time as may be necessary and as provided for in the Lease, Contract No. DA–29–005–ENG–2383 heretofore executed by the Secretary of the Army.

This is also to assure you that during the period of construction of the subject project and thereafter, such access and means of ingress and egress from the subject project to the public road or highway, will be suitably maintained.

From June 23, 1959 through February 4, 1960, all three principal access roads

to the Range were made available to plaintiff's personnel, subcontractors and material suppliers.

From the beginning of work under the contract, plaintiff was engaged in a labor dispute with the New Mexico Building and Construction Trades Council which was endeavoring to force plaintiff, an open shop contractor, to sign a union agreement. On February 3, 1960, the Base Commander was advised by the Council of a proposed strike against plaintiff and that the Council would place pickets at all gates to the Range. To avoid the posting of picket lines at all gates and to prevent possible interference with other projects at the Range, including national defense priority projects, the Base Commander sent plaintiff the following letter:

1. Effective 0600 hours, 4 February, 1960, D & L Construction Co., must limit its access to WSMR to a gate approximately 2½ miles west of highway 54 on the Camp Oro Grande Road.

2. A uniformed member of the Military Police will be available during normal working hours to divert D & L traffic via this route. This action is necessary in view of the strike which has been declared by New Mexico Building & Construction Trades Council against your company.

3. As soon as this strike is setteled [sic], the normal method of entry to WSMR will be again opened to your company.

Plaintiff promptly protested the Base Commander's letter and asserted that the limitation of its access would result in greatly increased costs because of the extra time and mileage necessary to travel from the material sources to the project site. On February 4, 1960, the Council called a strike against plaintiff and posted a picket line at the special gate which had been set up for plaintiff's use, with the result that there was a complete work stoppage on plaintiff's contract on that day.[9] Commencing on the next day, however, some of plaintiff's workmen engaged in limited contract operations at the work site.

On February 7, 1960, plaintiff addressed a letter jointly to the Base Commander and to the contracting officer pointing out that the closing of the access roads to plaintiff resulted in greatly increased traveling distance for many of plaintiff's work force and for the delivery of supplies, that the route designated for plaintiff's use included an unsatisfactory dirt detour, and that while plaintiff had "been able to maintain some job progress since the imposition of the blockade," it had been at very severely increased costs. Plaintiff demanded reopening of the access roads "which were available when the bid on this project was made and were agreed upon at the time of commencement of construction and which are now being afforded to other contractors on this base," and stated that plaintiff would treat a failure to reopen the access roads as a material breach which would cause plaintiff to rescind the contract and sue for damages.

On February 9, 1960, the Base Commander opened to plaintiff a second access road, and on February 15, 1960, upon resolution of the dispute between plaintiff and the Council and the removal of the pickets, all restrictions placed on plaintiff's ingress and egress to the Range were withdrawn.

On December 22, 1960, the contracting officer, in response to plaintiff's claim alleging delays because of Government "blockading of all of the access roads to the project but one," found that the

---

9. There was no picketing at any of the other gates and no other contract work was affected. The picket signs at the special gate which had been set up for plaintiff's use read:

"D & L CONSTRUCTION COMPANY ONLY
UNFAIR—NO CONTRACT—NO WORK

Carpenters
Laborers"

order of the Base Commander did not have any effect on the completion of the work, "since there was in concurrent operation an overlapping independent cause, namely, an earlier announced laborers craft local strike and concomitant picketing of the said two gates held for exclusive use by the eligible builder," that most of the crafts were honoring the picket line by refusing to work, and that even if the other access roads had been open to plaintiff, "progress would nevertheless have lagged due to the said strike." The contracting officer then found that the strike and picketing caused delay in the completion of plaintiff's work on the project, that the delay was without the fault or negligence of plaintiff, and, therefore, extended the time for completion of the project by 14 days, but did not allow plaintiff additional compensation.[10] Thereafter, plaintiff appealed its claim for additional compensation to the ASBCA but then withdrew the claim without prejudice. Both parties have treated the issue as one of alleged breach of contract to be decided by this court on the basis of an extensive stipulation, and have agreed that the issue of damages be reserved for further proceedings if necessary.

■■■■ It has long been established that while the United States cannot be held liable directly or indirectly for public acts which it performs as a sovereign, the Government can agree in a contract that if it does exercise a sovereign power, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act, and that this agreement can be implied as well as expressed. Amino Bros. Co. v. United States, 372 F.2d 485, 178 Ct.Cl. 515, cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); Ottinger v. United States, 88 F.Supp. 881, 116 Ct.Cl. 282 (1950). It is also settled that although the Government is not liable for damages resulting

from the action of third parties, it may be held liable if it extended to the contractor a warranty which was breached. Dale Constr. Co. v. United States, 168 Ct.Cl. 692 (1964).

■■■■ It is clear that defendant, both by the contract documents and by the assurance of the contracting officer, warranted that there would be "suitable access" to the project during the construction period. It is obvious, moreover, that plaintiff did not, during the period in question, have suitable access to the project. It would appear that the extent of plaintiff's damage occasioned on the one hand by the refusal of some of the workmen to cross the picket line (for which defendant was, of course, not liable), and on the other hand by the closing of the access roads, is a matter of proof and not a matter of defendant's liability under the warranty that plaintiff would have suitable access to the project. J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965).

The instant case is somewhat similar to Gerhardt F. Meyne Co. v. United States, 76 F.Supp. 811, 110 Ct.Cl. 527 (1948), in which the specifications provided that the truck entrance to the site was to be via Patten Road. When the plaintiff-contractor was about to begin work on the project, the military authorities ordered the south entrance to Patten Road closed. This made it necessary for the plaintiff to construct a temporary road from a substituted entrance to an existing unpaved road which the plaintiff was obliged to surface. This court held that defendant's representation that certain roads would be available carried with it the implied promise that if they were not, defendant would stand the resulting increased cost.

It is concluded that plaintiff is entitled to recover on this claim, with the amount of recovery to be determined under Rule 47(c).

---

10. The contracting officer's findings of fact are not, of course, to be accorded Wunderlich Act finality. *L. Rosenman Corp.*, supra.

## CONCLUSION OF LAW

On the administrative record, a stipulation and briefs of the parties and for the reasons stated above in the foregoing opinion which includes therein such facts as are necessary thereto, it is concluded that plaintiff is not entitled to recover on Claims 2 and 3 and as to these claims plaintiff's petition is dismissed; that plaintiff is entitled to extra compensation under the changes provisions of the contract on Claim 1 and proceedings are suspended so that the parties can return to the Armed Services Board of Contract Appeals for determination of the amount due; and that plaintiff is entitled to recover in this court on Claim 4 and judgment is, accordingly, entered for plaintiff on this claim, with the amount to be determined under Rule 47(c).