TECON CORPORATION and Green Construction Company, a Joint Venture, trading as Tecon-Green

v.

The UNITED STATES.

No. 99-67.

United States Court of Claims.

June 20, 1969.

David V. Anthony, Washington, D.C., for plaintiff; Gilbert A. Cuneo, Washington, D.C., attorney of record. Sellers, Conner & Cuneo, Washington, D.C., of counsel.

Edward M. Jerum, Washington, D.C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

Plaintiff, a joint venture, seeks review under the Wunderlich Act of a decision of the Corps of Engineers Board of Contract Appeals. Tecon-Green (A Joint Venture), 67–1 BCA ¶ 6147 (ENG BCA 1967). The board denied plaintiff's appeals on three claims for extra work arising under the Changes or Changed Conditions clause of a contract with the Corps of Engineers (DA–41–443–CIV-ENG–61–100). A fourth claim, on which recovery was allowed by the board, is the subject of a counterclaim by defendant here.

The contract obliged plaintiff to complete the embankment and spillway and to construct a service road for Canyon Dam and Reservoir, Guadaloupe River, Texas. The dam is an elongated earthenwork structure, a cross-section of which resembles the side view of a truncated cone.

Because plaintiff's claims involve different aspects of the performance, the facts pertinent to each claim are set forth in the discussion below. The parties rely on the administrative record and the pleadings in moving for summary judgment. On the undisputed material facts before us, we find that the board erred in denying plaintiff relief on one of its claims (the so-called "roller weight" claim), but that its decision is in all other respects correct as a matter of law and supported by substantial evidence. The case is returned to the board for determinations on the issue of quantum in accordance with this decision.

### TRIAXIAL TESTING CLAIM

Plaintiff was instructed to supply labor and equipment to assist the Government in taking soil samples to determine the strength of the material when placed and compacted. Approximately 700 samples were taken. Plaintiff argues that it was not required by the contract to provide the personnel and equipment used in making the tests, and supplying these items was extra work for which it should be compensated under the Changes clause.

To obtain the test material, an hydraulic jack would be braced against a piece of equipment, usually the blade of a tractor. A cylinder would be forced into the soil by means of the jack, then removed by digging up the earth around it, leaving undisturbed the soil sample lodged within.

As found by the board, the type and number of tests made were reasonable and normally incident to the type of construction involved. It also was found that the labor and equipment used were no more than necessary.

The parties agree that the issue is a matter of contract interpretation. The pertinent portion of the relevant provision is as follows:

### 9. INSPECTION

\* \* \* \* \* \*

(b) The Contractor shall furnish promptly without additional charge, all reasonable facilities, labor, and materials necessary for the safe and convenient inspection and test that may be required by the Contracting Officer. All inspection and tests by the Government shall be performed in such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be as described in the specifications. The Contractor shall be charged with any additional cost of inspection when material and workmanship are not ready at the time inspection is requested by the Contractor.

■ Plaintiff reads the Inspection clause as requiring the contractor to make the site safely and conveniently available to the Government for testing purposes, but not as requiring the contractor's participation in the actual sampling. It is our opinion that this construction of the provision is unreasonable.

The fact that plaintiff chooses to emphasize here the adjectives "safe" and "convenient" cannot minimize the substance of the contract's mandate that the contractor provide all items reasonably necessary for the testing. Nor, contrary to plaintiff's argument, is the second sentence of the specification in any way inconsistent with this requirement. The statement that tests "by the Government" should not unnecessarily interfere with the progress of the work cannot, when read together with the first sentence, mean that the sampling was to be performed with Government personnel and material. Rather, as the undisputed facts here show, the Government required the tests, and supervised the sampling using contractor-provided labor and equipment. Such testing was nonetheless "by the Government," since performed at defendant's insistence and as defendant directed.

Further, we agree with the board's implicit view that, under plaintiff's reading of the Inspection clause, the contractor, to make the site "safe and convenient" under this contract, would have had to do no more, in effect, than keep its personnel and equipment out of the way. Plaintiff's construction is patently inconsistent with the positive statement that the contractor was to "furnish" the necessary labor and materials. Its reading also makes a nullity of the language "without additional charge": no contractor in plaintiff's position could reasonably expect to be compensated for mere noninterference, and the phrase would accordingly have no purpose.

■ A construction of a contract provision which gives meaning to all its languages is to be favored. Morrison-Knudsen Co. v. United States, 397 F.2d 826, 184 Ct.Cl. 661 (1968). Even though the instant specification is a standard-form clause, we cannot consider its terms in a vacuum, but must read it in light of the nature, scope, and other provisions of the contract in which it is included. *See* Wertheimer Constr. Co. v. United States, 406 F.2d 1071, 186 Ct.Cl. 836 (1969); Morrison-Knudsen Co. v. United States, *supra.*

But, argues plaintiff, if defendant's reading of the clause is accepted, the contractor could have been expected to provide the laboratory facilities, personnel, and sophisticated equipment to actually test the samples. Whether such a requirement could be found in the specification in other circumstances need not be decided here. It is sufficient to note that the contractor is protected from the unforeseen expense of inordinate Government demands by the qualification that

the contractor provide "reasonable" facilities, labor, and materials. *See* Wilkins Co., 65–2 BCA ¶ 5242 (FAACAP 1965).

█ Plaintiff correctly states the rule of law that a contractual ambiguity is resolved against the drafter of the provision involved. *E.g.*, Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398 (1968); Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968). But it is also true that before the rule applies, the ambiguity must be a substantial and reasonable one. *E.g.*, A.R.F. Products, Inc. v. United States, 388 F.2d 692, 181 Ct.Cl. 1176 (1967); Keco Indus., Inc. v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967). We do not find such an ambiguity here.

The board did not err in denying plaintiff's triaxial testing claim.

## RIPRAP CLAIM

Under the contract plaintiff was required to place a layer of stone upon the upstream slope of the dam and elsewhere to minimize wave action and otherwise prevent erosion of the earthern embankment. This riprap was to be placed in accordance with the following specification:

5–5. *Riprap.*

\* \* \* \* \* \*

(b) *Placement.*—Stone for "riprap" shall be placed on the bedding layers in such manner as to produce a reasonably well-graded mass of rock with the minimum practicable percentage of voids, and shall be constructed within the specified .tolerance to the lines and grades shown on the drawings or staked in the field. A tolerance of plus 4 inches or minus zero inches from the slope lines and grades shown on the drawings will be allowed in the finished surface of the riprap. Riprap shall be placed to its full course thickness at one operation and in such a manner as to avoid

displacing the bedding material. The larger stones shall be well distributed and the entire mass of stones in their final position shall be roughly graded to conform to the gradation specified in paragraph (a) above. The finished riprap shall be free from objectionable pockets of small stones and clusters of larger stones. Placing riprap in layers will not be permitted. Placing riprap by dumping into chutes or by similar methods likely to cause segregation of the various sizes will not be permitted. The desired distribution of the various sizes of stones throughout the mass shall be obtained by selective loading of the material at the quarry or other source; by controlled dumping of successive loads during final placing, or by other methods of placement which will produce the specified results. Rearranging of individual stones by mechanical equipment or by hand will be required to the extent necessary to obtain a reasonably well graded distribution of stone sizes as specified above. \* \* \*

The essence of plaintiff's claim is that the Government required so smooth a finished surface for the riprap that hand labor in excess of what was required by the specifications was necessary. The additional breaking and hand placement of stones, it is argued, was extra work compensable under the Changes clause.

More specifically, plaintiff predicates its argument upon a claim letter sent to the contracting officer on December 6, 1963. Approximately 50 percent of the riprap surface had been finished at that time. In its letter the contractor notified the Government that it was proceeding under defendant's directions to finish the riprap to a smoothness in excess of contract requirements, and it requested payment therefor as additional work. Although the Government promptly replied, stating that the matter was under investigation, no decision was rendered until some time after the contract was completed. Plaintiff's pro-

posed finding summarizes its theory of defendant's liability.

2. "The Contracting Officer's knowledge that Plaintiff was furnishing the ultra smooth riprap finish under the impression that it had been directed to do so by the Government, that Plaintiff considered such riprap finish as exceeding the contract requirements and expected to be paid for it, imposed a duty on him to either admit or deny the direction of which the Government was accused. His failure to deny the alleged direction until after Plaintiff had completed the remaining 50% of the riprap work is alternatively, conclusive evidence that in fact such direction had been given, or legally estops the Contracting Officer from denying that such direction was given."

From the testimony of defendant's witnesses, however, the board determined that no directive had been issued by defendant concerning the riprap finish. Apparently based upon the testimony of defendant's resident engineer, the board found it likely that the very smooth surface resulted from the decision of plaintiff's project manager to emulate work he had observed in process on other jobs in the San Antonio area. We approve these findings, since they are well supported by substantial evidence.

We also agree with the board's mixed finding of fact and law that plaintiff's actual performance did not exceed the literal terms of the contract. The Placement provision, unlike many specifications in Government contracts, is very general in its requirements. Except for the allowance for a 4-inch depth tolerance, the clause is cast in terms of reasonableness: "reasonably well-graded mass of rock with the minimum practicable percentage of voids." There is no specification of the required smoothness (except that it be "roughly graded") or the amount of hand finishing expected. Considering the very general language of the clause and the testimony and ex-

hibits indicating that plaintiff's finished surface had depth variations in excess of the 4-inch tolerance and had no more than a minimum practicable number of voids or objectionable pockets of small or large stones, we cannot say that plaintiff's performance exceeded the contract's specifications.

Plaintiff strenuously asserts, however, that all the contract required was the minimum finished riprap surface that would meet the stated general standards. It points to paragraph 31 of the Government's answer before the board—wherein it was admitted that riprap less smooth had been accepted on other projects under similar specifications—to show that it performed work in excess of the minimum required.

■ We assume arguendo that a riprap finish less smooth than that furnished by plaintiff could have satisfied contract requirements. The assumption, however, that plaintiff's finishing work was of better quality than the minimum demanded by the contract does not necessarily mean that the Government is liable for the additional costs to plaintiff of the higher standard of performance. To recover, the contractor must show that some Government fault caused its increased costs. A.R.F. Products, Inc. v. United States, 388 F.2d 692, 181 Ct.Cl. 1176 (1967). Plaintiff finds this fault in the failure of defendant to promptly deny the existence of a directive concerning the riprap finishing, and requests this court to estop the Government to now deny the existence of that order.

■ We do not find grounds for estoppel against defendant. The Government's involvement in the instant situation was entirely passive. As found by the board, the contractor was apparently responsible for initiating the high-quality riprap work. The contractor continued to place riprap for 18 months before its claim was even brought to the Government's attention. Clearly, the added costs of the first 50 percent of the work

are in no way the result of defendant's alleged delay in deciding the claim. No showing has been made of conduct by defendant which induced, coerced, encouraged, or persuaded plaintiff to perform as it did.

After the claim letter was submitted, the contractor maintained the same level of performance until the completion of the riprap operation. Accordingly, plaintiff did not *change* its position, detrimentally or otherwise, in reliance upon any Government action or inaction, and estoppel will not lie. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 736, 177 Ct.Cl. 776, 789 (1966). The more pertinent cases cited as authority by plaintiff[1] either involve reliance by a contractor upon some positive Government inducement or encouragement, or concern defendant's silence while the contractor unknowingly deviated from specifications. They are therefore inapposite.

The mere existence of a mistake on plaintiff's part, even if the Government actually knows of it, does not always and automatically invest defendant with an affirmative duty to correct the misimpression. This is not a case in which the contractor was unwittingly performing in excess of the contract specifications while the Government, by its conscious silence, was being unjustly enriched. As long as a contractor is performing within the scope of the contract, we do not believe that defendant is either unjustly benefited or under any obligation to inform the contractor, in effect, that the job he is doing is of higher than minimum quality.

The board's decision on the riprap claim is affirmed.

### ROLLER WEIGHT CLAIM

The earth placed in constructing the embankment was to be compacted in part in accordance with the following specifications:

4-8. *Compaction.*

(a) *Equipment.*—Compaction equipment shall conform to the following requirements and shall be used as prescribed in subsequent paragraphs. The contractor shall have both tamping rollers and rubber-tired rollers on the job.

(1) *Tamping Rollers.*—Tamping rollers shall consist of a heavy duty double drum unit with a drum diameter not less than 60 inches and an individual drum length of not less than 60 inches. The drums shall be water or sand and water ballasted. Each drum shall have staggered feet uniformly spaced over the cylindrical surface such as to provide approximately three tamping feet for each two square feet of drum surface. The tamping feet shall be 7 to 9 inches in clear projection from the cylindrical surface of the roller and shall have a face area of not less than 5 nor more than 7 square inches. The roller shall be equipped with cleaning fingers, so designed and attached as to prevent the accumulation of material between the tamping feet, and these cleaning fingers shall be maintained at their full length throughout the periods of use of the roller. The weight of the roller shall not be less than 2500 pounds per foot of linear drum length weighted, and shall not be more than 1800 pounds per foot of drum length empty. The design and operation of the tamping roller shall be subject to the approval of the contracting officer who shall have the right at any time during the prosecution of the work to direct such repairs to the tamping feet, minor alterations in the roller, and variations in the weight as may be found necessary to secure optimum

1. Williams v. United States, 127 F.Supp. 617, 130 Ct.Cl. 435, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955); Norair Eng'r Corp., 67-2 BCA ¶ 6396 (NASA BCA 1967); Yukon Constr. Co., 67-1 BCA ¶ 6334 (ASBCA 1967); Lox Equip. Co., 1964 BCA ¶ 4463 (ASBCA); W. Southard Jones, Inc., 61-2 BCA ¶ 3182 (ASBCA 1961); Brooks Labs Co., 1962 BCA ¶ 3597 (ASBCA).

compaction of the earth fill materials. The roller shall be pulled by a crawler-type tractor of sufficient power to operate the roller at a speed of approximately 2½ miles per hour.

The board found that the contractor provided tamping rollers that complied with the specifications, but which, when filled to capacity, greatly exceeded 2,500 pounds in weight per linear foot of drum length (1,565 pounds empty; 3,677 pounds when ballasted with sand and water). Defendant's resident engineer, the authorized representative of the contracting officer, directed plaintiff to ballast the rollers to achieve an operating weight in excess of 3,500 pounds per linear foot.

Plaintiff argues that the contract required it to supply rollers having a filled operating weight capacity of approximately 2,500 pounds per linear foot, and it bid and reasonably expected to perform by employing the 2,500 pounds specified. When the contracting officer directed the use of a roller weight in excess of the expected minimum, the contractor incurred the unanticipated and necessary costs of operating a larger tractor (a "D–8") than expected (a "D–7") and increased roller ownership and equipment expense. Plaintiff seeks recovery of its additional expenses under the Changes or Changed Conditions clause.

The board's conclusion, urged here by defendant, was that the weight limits provided in the specification were intended to be descriptive of the type of roller required and were stated in variable terms to allow the contractor leeway in the selection of his equipment. In the board's view, nothing was mentioned in the provision concerning the actual weight at which the rollers were to be operated. There is no question that the weight required at the site was necessary to achieve "optimum compaction." Accordingly, the representative of the contracting officer was acting within his contractual authority "to direct * * * variations in the weight as may be found necessary to secure optimum compaction of the earth fill materials."

■ It is our opinion that the board's interpretation of the contract is unreasonable and in error as a matter of law. Questions of contract interpretation are questions of law, concerning which this court is entitled to make its own decision de novo. Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968); D & L Constr. Co. & Associates v. United States, 402 F.2d 990, 185 Ct.Cl. 736 (1968); Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968).

As plaintiff argues, the specification created a definite weight range of approximately 1,800 to 2,500 pounds per linear foot. Although, from the "no more than" and "not less than" language, the range appears to be open-ended (very likely, as the board suggests, to allow flexibility in the selection of equipment), it seems patently clear that the only inference that could be drawn from a fair reading of the specification was that the operating weight of the rollers would fall roughly within the given range. When the specification is read as a whole, the contracting officer's discretionary authority to vary the weight to achieve optimum compaction would seem logically to apply to the actual operating weight within the minus 1,800 pounds and 2,500 pounds plus limits. Use of the rollers at weights in the vicinity but in excess of 2,500 pounds should have been anticipated, but a contractor could not have reasonably expected to operate its rollers at a weight 40 percent in excess of the stated range limit.

■ A contractor bids upon the information given to it by the Government and ascertainable by diligent inspection and inquiry, where ambiguity necessitates it. Were the contractor required to anticipate what unforeseen circumstances or changed Government requirements might cost, the bid process would be reduced to a purely aleatory procedure, resulting either in exorbitant cost

to the United States on one hand or in contractor defaults and bankruptcy on the other. This is precisely the type of situation the Changes and Changed Conditions clauses were designed to obviate. Therefore, the reading of the Compaction provision urged by the Government, whereby the contractor could be exposed to unanticipated expenses of thousands of dollars (plaintiff allegedly incurred $195,000 in additional costs), must yield to a clearly reasonable interpretation which accords with the fundamental policies embodied in the Government contract process.

The Government, as drafter, must bear the burden of unclarity. There is uncontradicted testimony in the record to indicate that defendant knew during the negotiation stage that the rollers would have to be weighted to 3,500 pounds. The Government should have conveyed its knowledge to the bidders, and its failure to do so was at its own peril. The applicable law was succinctly stated in L. Rosenman Corp. v. United States, 390 F.2d 711, 714, 182 Ct.Cl. 586, 590–591 (1968):

> * * * Although the specifications and drawings may have been clear as a bell in the mind of defendant's architect, it is not the subjective intent that is the legal determinant. National Movers Co. Inc. v. United States, 396 F.2d 999, 1001–1002, 181 Ct.Cl. 419, 424–425 (1967). Rather, it is the representations of the specifications and drawings themselves which represent defendant's intent. And these were not so clear as to compel plaintiff to seek clarification, or as to make defendant's interpretation binding upon plaintiff. See, Tufano Contracting Corp. and Anthony Grace & Sons, Inc., Joint Venture v. United States, 356 F.2d 535, 539, 174 Ct.Cl. 398, 405 (1966). "The Government, as the author, [of the contract] has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that

responsibility." WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963). Here defendant did not meet its burden. If it had wanted automatic radiator valves on all 15 floors, it should have said so explicitly. * * *

Similarly, if the Government here had desired a 3,500-pound weight, it should have so indicated. We find, therefore, that plaintiff is entitled to an equitable adjustment under the Changes clause and return the case to the board for findings on the issue of quantum. However, as discussed below, it appears that some adjustment in the amount of recovery may be necessary by virtue of the decision on the tandem claim.

## TANDEM ROLLER COUNTERCLAIM

Defendant counterclaims here against the board's decision entitling plaintiff to recover on its so-called tandem roller claim. The interpretation of the following specification is at issue:

> 4–8. *Compaction.*
>
> * * * * * *
>
> (b) *Impervious Fill.*—After a layer of impervious fill material has been dumped and spread, it shall be harrowed, if required, to break up and blend the fill materials, unless harrowing, as specified under paragraph 4–7(a) is performed to obtain uniform moisture distribution. Harrowing shall be performed with a heavy disc plow, or other approved harrow, to the full depth of the layer. If one pass of the harrow does not accomplish the breaking up and blending of the materials additional passes of the harrow may be required. When the moisture content and the condition of the layer is satisfactory, the lift shall be compacted by not less than 8 complete passes of the tamping roller. A complete pass shall consist of the entire coverage of the area with one trip of the equipment specified. Each trip of the tamping roller shall overlap the adjacent trip not less than 2 feet. * * *

In compacting the fill, the contractor proposed to pull tamping rollers in "true tandem," that is, one set of double-drum rollers connected to another set directly behind it, both pulled by a single tractor. The contracting officer refused to permit plaintiff to pull rollers in tandem unless the rear pair was offset so that the paths of the two sets overlapped in accordance with the "adjacent-trip" requirement. Because of the stress upon the equipment occasioned by the offset tandem operation, plaintiff soon abandoned this method as impracticable and was relegated to single-set operation. Plaintiff sought from the board, and was granted, an equitable adjustment under the Changes clause for the additional tractor-hour expense thereby incurred.

The Government's position is essentially that the singular language of the specification—"pass," "trip," "the tamping roller"—precludes an interpretation of the provision to allow true tandem roller operation. As defendant views the provision, each trip of the roller had to be adjacent to and overlapping the path of the previous trip.

 The board found, however, with ample support in the transcript and exhibits, that tandem rolling was accepted industry practice. Although a Government witness stated that tandem rolling was not accepted practice in dam construction, this testimony was contradicted by plaintiff's witnesses. The board's resolution of issues of witness credibility will ordinarily be accepted by the court—particularly if, as here, the testimony is expert—unless inherently improbable or contradicted by uncontroverted evidence. Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968); Eggers & Higgins v. United States, 403 F.2d 225, 185 Ct.Cl. 765 (1968); J. A. Terteling & Sons, Inc. v. United States, 390 F.2d 926, 182 Ct.Cl. 691 (1968).

The board also found that the proposed tandem operation was not precluded by the specifications and would have satisfied the substance of the Government's requirements—that each part of the ground be rolled eight times, with sufficient overlap of adjacent trips to assure complete coverage. Plaintiff's reading of the provision was accordingly held to be reasonable.

 It is our opinion that the board's factual determinations in this respect are amply and substantially supported by the record. We agree with the board that plaintiff's interpretation of the Compaction provision in the light of industry practice was entirely reasonable. Accordingly, any ambiguity in the specification must be resolved against the Government. Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398 (1968); Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968). Defendant's motion with respect to its counterclaim is therefore denied, and the board's decision is affirmed.

Upon return, the board is requested to consider whether, and to what extent, the recoveries under the roller weight and tandem roller claims may be duplicitous. Since the record was not directed to the issue of quantum and the board made no findings in this regard, we intimate no opinion on this question here. But we note, for example, that the tractor plaintiff was obliged to use to pull the 3,500-pound rollers was a D–8 instead of the planned D–7. There is testimony in the record indicating that plaintiff expected to use a D–8 tractor to pull the rollers in tandem. Accordingly, there would appear to be an overlap in both claims for a portion of the D–8 tractor hours for which recovery is sought. Other areas of duplication not now apparent may be disclosed by facts yet to be presented. The board is authorized to modify plaintiff's relief under either or both claims to the extent necessary to avoid double recoveries.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is granted with respect to its roller weight

claim and judgment is entered for plaintiff on that claim. In all other respects plaintiff's motion is denied, and the other claims of the petition are dismissed. Defendant's cross-motion for summary judgment is granted on the triaxial testing and riprap claims, but is denied with regard to the roller weight claim and the tandem roller counterclaim, and the counterclaim is dismissed. The case is returned to the board for a period not in excess of 90 days for a determination, in accordance with this opinion, of the amount of the equitable adjustment to which plaintiff is entitled under the roller weight and tandem roller claims. Plaintiff shall comply with Rule 100 and the General Order of April 1, 1968.