**LEAVELL–MORRISON–KNUDSEN–
HARDEMAN
v.
The UNITED STATES.
No. 224–68.**

United States Court of Claims.
Jan. 22, 1971.

Eugene R. Anderson, New York City, attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, LARA-MORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

■ This case was referred to Trial Commissioner Mastin G. White with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on April 10, 1970, wherein such facts as are necessary to the opinion are set forth. Defendant filed a request for review by the court of the commissioner's opinion and report and plaintiff has urged that the court adopt the commissioner's opinion and conclusion. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. The court agrees with Commissioner White and adopts his opinion with modifications.* The best that can be said for the defendant is that the contract documents were ambiguous in their indications of what were "ducts" for insulation purposes; that being so, the plaintiff's interpretation, which was undoubtedly reasonable must be accepted since the government was the drafter. United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). Accordingly, the court adopts the commissioner's opinion and recommended conclusion, with modifications, as hereinafter set forth, together with the above, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied; and judgment is entered for plaintiff in accordance with the opinion, with further proceedings stayed for a period of 90 days pursuant to Rule 167 pending an administrative determination of the eq-uitable adjustment to which plaintiff is entitled.

Commissioner White's opinion, with modifications by the court, is as follows:

The question presented in this case is whether the decision which the Corps of Engineers Board of Contract Appeals rendered on November 29, 1967 (Eng BCA No. 2791), to the effect that the plaintiff was not entitled to an equitable adjustment under the "Changes" provision of Contract No. DA–41–443–ENG(NASA)–18 ("the contract"), should be upheld or reversed on being reviewed in accordance with the standards prescribed in the Wunderlich Act (41 U.S.C. §§ 321, 322).

■ It is my opinion that the administrative decision is not entitled to finality under the Wunderlich Act standards and, accordingly, should be reversed.

The plaintiff is a joint venture, consisting of C. H. Leavell & Company, Morrison-Knudsen Company, Inc.. and Paul Hardeman, Inc.

The contract was entered into between the plaintiff and the defendant (represented by the U. S. Army Engineer District, Corps of Engineers, Forth Worth, Texas) on November 30, 1962. It covered the construction by the plaintiff for the defendant of several buildings comprising phase III of the Manned Spacecraft Center, National Aeronautics and Space Administration, located at Clear Lake, Harris County, Texas. The total estimated contract price was $19,-180,625.39. The contract contained the standard "Changes" and "Disputes" provisions that are customarily found in Government construction contracts.

The contract provided for the installation of an air-conditioning system in the buildings that were to comprise phase III of the Manned Spacecraft Center. The plaintiff entered into a subcontract with Natkin & Company relative to the installation of the air-conditioning equipment under the contract; and the

---

* The dissenting opinion of SKELTON, Judge, follows the opinion of the Trial Commissioner which has been adopted by the court as modified.

subcontractor, in turn, entered into a sub-subcontract with Mundet Cork Corporation relative to the insulation of the air-conditioning equipment.[1] Subsequently, the insulation division of Mundet Cork Corporation was acquired by Baldwin-Ehret-Hill, Inc., which thereby became the insulation sub-subcontractor.

The controversy in the present case relates primarily to the portion of the contract specifications governing the insulation of air-conditioning ducts, i. e., paragraph 58–25(b) of the technical provisions of the contract. Paragraph 58–25(b) stated in pertinent part as follows:

> (b) *Duct Insulation.*—Ducts shall be insulated with 1-inch thickness as hereinafter specified. Insulation 'for circular ducts shall be of the flexible type with a minimum density of 1½ lb. per cubic foot. Insulation for rectangular ducts shall be of semi-rigid type and shall have a minimum density of 3-lb.-per-cubic-foot and with flame resistant factory applied reinforced foil and kraft paper laminate, or laminated aluminum foil consisting of two plies of 1-mill aluminum foil with glass-yarn reinforcing. * * * All fresh-air-intake ducts and air conditioning supply ducts * * * shall be insulated with 1-inch-thick material as specified hereinbefore * * *.

On its face, the contract provision quoted in the preceding paragraph was unambiguous. It plainly required—and the plaintiff does not contend otherwise—that "ducts" in the air-conditioning system be insulated.[2]

The insulation sub-subcontractor began its work on the second floor of Building 2, which was one of the buildings covered by the contract. After the insulation work had been completed there (with the approval of the defendant's inspector on the job), the second-floor ceiling had been installed beneath the air-conditioning equipment, and the insulation sub-subcontractor was proceeding with its work elsewhere, the contracting officer's representative discovered that the sub-subcontractor was not insulating the flexible connectors which connected the air-conditioning ductwork on the low-pressure side of the system with the ceiling slot diffusers for the dissemination of conditioned air throughout the occupied space in the different rooms. The connectors in question were hollow, flexible, concertina-like pieces of hose, about 4 feet long and about 6 inches in diameter. They were made of fabric, although the fabric was reinforced with a spiral of steel in the form of a round wire or a narrow strip, which kept the fabric from sagging inwardly. The function of the connectors was to convey air between the air-conditioning ductwork and the ceiling slot diffusers previously mentioned.

The plaintiff, the air-conditioning subcontractor, and the insulation sub-subcontractor had construed the provisions of the contract as not requiring that the flexible connectors mentioned in the preceding paragraph be insulated; and they had based their respective cost estimates upon such construction. The defendant's inspector had similarly construed the provisions of the contract and had so informed the insulation sub-subcontractor.

The contracting officer's representative wrote a letter to the plaintiff (i. e., the prime contractor) on September 9, 1963, and stated in part as follows:

> A recent inspection of your construction work indicated that the flexible connection ducts utilized in the distribution of air conditioning and heating in various buildings are not being insulated in accordance with the applicable provision of your contract

---

1. The subcontract and the sub-subcontract also covered other matters that are immaterial in so far as the present litigation is concerned.

2. There were some exceptions, but they are not pertinent here.

specifications, particularly paragraph 58–25.

\*   \*   \*   \*   \*   \*

It is requested that this office be advised as to the method your organization proposes to accomplish the insulation of the flexible ducts.

The plaintiff replied on September 12, 1963, to the letter mentioned in the preceding paragraph, and stated in part as follows:

Reference your letter, dated 9 September 1963, relative to an alleged deficiency in air conditioning duct work insulating procedure, particularly alleging that flexible connections between ceiling slot diffusers and low pressure air distribution systems are not being insulated. You, also, request that you be advised as to the method we propose to employ in applying insulation to such flexible connections.

\*   \*   \*   \*   \*   \*

We, do not at this time, intend to apply insulation to flexible connectors in any other structures, being constructed under this contract until receipt of an official directive based upon an interpretation by the Contracting Officer.

The contracting officer's representative then wrote to the plaintiff on September 16, 1963, and stated in part as follows:

\*   \*   \* You are informed that the insulation of the flexible ducts in the A/C Systems is considered a contract requirement and you are therefore directed to prosecute the work attendant with the insulation of the flexible ducts in the remaining buildings with such diligence as will insure completion of the structures within the allotted time.

In consideration of the status of work on the second floor of Building 2, this office will entertain an equitable credit for the non-insulation of the flexible ducts located in finished ceiling areas. Prompt submission of your credit quotation therefor will be appreciated.

The insulation sub-subcontractor, in accordance with the directive of September 16, 1963, proceeded, under protest, to insulate the flexible connectors on the low-pressure side of the air-conditioning system, except for the flexible connectors on the second floor of Building 2, where the ceiling had already been installed.

Under the date of April 23, 1964, the plaintiff submitted to the defendant's resident engineer a claim for additional compensation in the amount of $127,300. The basis for the claim was a contention that the insulation of the flexible connectors on the low-pressure side of the air-conditioning system was not required by the provisions of the original contract (*i. e.*, that the directive which required the placement of such insulation was a constructive change order entitling the plaintiff to an equitable adjustment upward in the contract price under the "Changes" provision of the contract). The claim was supported by documents from Natkin & Company, the subcontractor, and Baldwin-Ehret-Hill, Inc. (successor to Mundet Cork Corporation), the sub-subcontractor.

The plaintiff was unwilling for the contract price to be adjusted downward because of the failure to insulate the flexible connectors on the second floor of Building 2. In view of this, the contracting officer on June 12, 1964, unilaterally issued a change order, which stated in part as follows:

Delete insulating the flexible ducts to the combination light fixture-air diffusers indicated on Drawing No. MA–2–5, Sequence 194, Volume II to be located east of Column Line 7 on the 2nd floor of Building No. 2.

\*   \*   \*   \*   \*   \*

Because of the work deleted by this modification the approximate amount of the contract is decreased $1,561.68.
\*   \*   \*

The contracting officer denied the plaintiff's claim by means of a letter

dated July 6, 1965. The letter was accompanied by findings of fact.

The plaintiff appealed under the "Disputes" provision of the contract to the Chief of Engineers by means of a letter dated July 28, 1965.

The Corps of Engineers Board of Contract Appeals (acting for the Chief of Engineers) held a hearing in March 1967, and then rendered its decision on November 29, 1967 (Eng BCA No. 2791), denying the plaintiff's appeal.

The plaintiff filed its petition with this court on August 5, 1968.

The Corps of Engineers Board of Contract Appeals ("the Board") denied the plaintiff's appeal on the basis of the Board's conclusion "that it would be clear to one bidding the job that the specification drafter thought the connectors here involved were ducts," and that "it necessarily follows that bidders must have understood that the connectors were to be insulated with 1-inch thick material * * *."

The Board's conclusion, as quoted in the preceding paragraph, was not supported by substantial evidence in the administrative record. The Board's conclusion was really an inference drawn from the circumstance that "the specification drafter," in prescribing specifications for the flexible connectors, referred to them several times as "flexible ducts" or "flexible duct." The particular specifications were contained in paragraph 58–14(b) (1)*f* of the technical provisions of the contract, which stated in pertinent part as follows:

*f. Flexible ducts* for connection to high pressure mixing * * * [boxes] and ceiling slot diffusers shall be of the spiral reinforced fabric type. Flexible connections to ceiling slot diffusers shall have a minimum diameter of 6 inches. The spiral reinforced fabric weighing not less than 10 ounce[s] per square yard and a spiral reinforcement which may be either a round steel wire or crimped steel strip. * * * Flexible ducts shall not exceed five feet in length. Flexi-

ble duct shall meet the NBFU Standards, Pamphlet 90A, paragraph 113(a)3. * * * Entire flexible hose shall be air tight by factory tests * * *. Flexible ducts to lighting fixtures shall be 6-inch round and shall be provided with a transition piece from the flexible duct size to light fixture connection size. [Emphasis in original.]

It will be noted that although "the specification drafter" referred to the flexible connectors several times in this paragraph as "flexible ducts" or "flexible duct," he also referred to them in the same provision as "flexible connections" and as "flexible hose." This was semantic ineptness—not (as the Board concluded) a clear indication to bidders "that the specification drafter thought the connectors here involved were ducts."

◼ Actually, it is plain from an overall consideration of the contract specifications that "the specification drafter" did not regard flexible connectors as ducts. Paragraph 58–14(a) of the technical provisions of the contract expressly provided that "Ductwork shall be constructed of galvanized steel or aluminum sheets"; and paragraphs 58–14(b) and 58–14(c) then specified in great detail the respective gages and other characteristics of the metal that was to be used in constructing the different sizes of ducts. As previously noted, paragraph 58–14(b) (1)*f* of the technical provisions provided that the "flexible ducts" or "flexible connections" or "flexible hose" with which we are concerned in the present case should be made of "spiral reinforced fabric weighing not less than 10 ounce[s] per square yard"—not of galvanized steel or aluminum sheets.

The plaintiff contended before the Board—and contends before the court—that there is a general trade practice in the air-conditioning industry not to insulate flexible connectors on the low-pressure side of an air-conditioning sys-

tem. With respect to this contention, the Board made a finding as follows:

> \* \* \* Actually a consistent generally accepted trade practice does not seem to exist. Designers sometimes do and sometimes do not call for insulation. The choice is presumably dependent upon local weather conditions and other factors not fully explained in the record.

The Board's finding, as set out in the preceding paragraph, was supported by substantial evidence in the administrative record. However, the issue in the present case is not whether the customary trade practice in the air-conditioning industry does or does not call for the insulation of flexible connectors on the low-pressure side of an air-conditioning system. Rather, the question is whether the contract specifications did or did not call for such insulation. As to this, the contract specifications called for the insulation of air-conditioning ducts, but not for the insulation of flexible connectors, which are not ducts.[3]

It is concluded, therefore, that the provisions of the original contract did not require the plaintiff to insulate the flexible connectors on the low-pressure side of the air-conditioning system; and that the directive requiring such insulation was a constructive change order entitling the plaintiff to apply for an equitable adjustment in the contract price under the "Changes" provision of the contract.[4]

SKELTON, Judge (dissenting):

The majority correctly holds that there was substantial evidence in the administrative record to support the Board's finding that there was no customary trade practice in the air condi-

tioning industry that did or did not call for the insulation of flexible connectors on the low-pressure side of an air conditioning system. Therefore, the question of trade practice in the industry is no longer in the case.

This leaves two basic questions to be decided, which are:

(1) Did the contract specifications call for such insulation?

(2) Were the flexible "connectors" ducts?

Sub-paragraph 58–25(b) of the contract specifications dealing with duct insulation provides as follows:

> *Duct Insulation*—Ducts shall be insulated with 1-inch thickness as hereinafter specified. Insulation for circular ducts shall be of the flexible type with a minimum density of 1½ lb. per cubic foot. Insulation for rectangular ducts shall be of semi-rigid type and shall have a minimum density of 3-lb.-per-cubic-foot and with flame resistant factory applied reinforced foil and kraft paper laminate, or laminated aluminum foil consisting of two plies of 1-mill aluminum foil with glass-yarn reinforcing. Insulation shall be secured to rectangular ducts by impaling over metal-stick clips spaced 12-inches on centers each way and noncombustible mastic. Round-duct insulation shall be secured by 18-gauge copperweld wire spaced not over 12-inches on centers. In all cases where insulation joints occur, facing tabs shall be lapped not less than 2 inches and sealed with approved adhesive and noncombustible tape, of the same material as the vapor barrier. All punctures in facing material shall be sealed and a continuous vapor barrier shall be provided. *All fresh-air-*

---

3. The specifications referred to the flexible connectors on the high-pressure side of the mixing boxes as "flexible ducts," but there was no such characterization for the flexible connectors on the low-pressure side (which are the only ones involved in this case).

4. The insulation sub-subcontractor, without receiving any directive to do so, insulated the flexible connectors on the high-pressure side of the air-conditioning system. This was done in accordance with customary trade practice. No claim for extra compensation is made on account of this particular phase of the work.

*intake ducts and air conditioning supply ducts (that are not internally lined) shall be insulated with 1-inch-thick material as specified hereinbefore unless noted otherwise on the drawings.* Hot air duct from double duct units shall be insulated same as cold air duct except that the vapor barrier is not required to be sealed. All insulated ducts within equipment rooms and in other rooms exposed to view shall be provided with a 12-ounce brattice cloth and adhesive: Brattice cloth and adhesive shall be applied and shall meet all of the requirements specified under paragraphs 56–21(d)(1) of the section, "Heating System Forced Hot-Water Steam Converter" of these specifications. [Emphasis supplied.]

The majority correctly holds that the above paragraph of the contract is unambiguous and called for the insulation of air conditioning ducts. This leaves only the question of whether or not the so-called "connectors" were as a matter of fact "ducts." This is a fact question that could only be decided by the Board, inasmuch as this is a Wunderlich Act (41 U.S.C. §§ 321, 322) case and can only be reviewed by our court according to the standards prescribed by the Act. The Board did not find specifically in so many words that the connectors were ducts, but such was the clear import and meaning of its findings. In its decision, it referred repeatedly to the connectors as "ducts," "low pressure flexible ducts," "uninsulated duct," "the duct," "flexible duct," "such duct," and "this duct."

Notwithstanding the findings by the Board that the connectors were ducts, which are binding on this court, the majority proceeded to make a contrary finding on this fact question by holding that the flexible connectors "are not ducts." I think this was error.

Furthermore, the connectors were ducts by the very terms of the contract specifications. Sub-paragraph 58–14(b)(1) f provided as follows:

*Flexible ducts* for connection to high pressure mixing boses [sic] and ceiling slot diffusers shall be of the spiral reinforced fabric type. The spiral reinforced fabric weighing not less than 10 ounces per square yard and a spiral reinforcement which may be either a round steel wire or crimped steel strip. The spiral reinforcement shall be zinc-coated unless completely enclosed and sealed by the fabric. Flexible ducts shall not exceed five feet in length. Flexible duct shall meet the NBFU Standards, Pamphlet 90A, paragraph 113(a)3. Fabric shall be UL listed as flameproof. All ductwork shall be suitable for high pressure air distribution system with minimum leakage at recommended operating pressures. Duct shall be tested for burst pressure and this value shall be listed with the corresponding duct size. All connections on joints of duct shall be as recommended by the manufacturer to assure perfect seal. Each connection shall be taped. Required time for drying of joints shall be observed. Entire flexible hose shall be air tight by factory test when bent to full recommended radius and under not less than 15-inches $H_2O$ internal pressure. Flexible ducts to lighting fixtures shall be 6-inch round and shall be provided with a transition piece from the flexible duct size to light fixture connection size.

It will be noted that the connectors are referred to nine times as either "flexible ducts," "flexible duct," "ductwork," and "duct," and one time as "flexible hose." They are never called "connectors." In my opinion, the single time when the words "flexible hose" were used, they were meant to be merely a descriptive phrase of flexible ducts because they resemble flexible hose. The contract required all ducts to be insulated unless the drawings showed otherwise. The drawings did not indicate that these flexible ducts were not to be insulated. The specifications were controlling and required their insulation.

These flexible ducts were ducts as a matter of fact. Those on the low pressure side of the mixing boxes served the same function as their identical counter-parts on the high pressure side, namely as conduits for the passage of air. The plaintiff admits that those on the high pressure side were ducts and insulated them as required by the contract and seeks no recovery for doing so. Yet, the contract makes no distinction between them as far as insulation was concerned. The plaintiff did not insulate the ducts on the low-pressure side because of an erroneous belief that customary trade practice in the industry did not require it. No such customary trade practice was found to exist.

Also, the Board found as a fact that such insulation would increase the efficiency of the system when it said:

> * * * We accept the expert testimony of the Government witness that insulation would increase efficiency. * * * [*Id.* at 7.]

Such increased efficiency was, no doubt, the reason why the government required *all* ducts to be insulated by the contract specifications. Since the contract called for such insulation, the plaintiff had no right to decide unilaterally that it would not insulate the low-pressure ducts because in its opinion such insulation was not needed. If a contractor is allowed to change the specifications in this manner, the government could never be sure of getting what the contract calls for.

Furthermore, plaintiff submitted a drawing and a letter from the manufacturer of a "Wiremold Flexible Air Duct" which the manufacturer said complied with paragraph 58–14(b) (1)*f* (quoted above) prior to installation. (Board opinion p. 4, Board Rec. Vol. 2, Exh. I.) In presenting these documents, plaintiff referred to the item as a "flexible air duct" and included a drawing of it and represented that it complied with the contract specifications. It would appear that plaintiff's present contention that the flexible air ducts were not "ducts" is an afterthought.

I would affirm the decision of the Board and hold that the flexible air ducts were ducts within the meaning of the contract specifications and plaintiff was required to insulate them as a part of his obligation under the contract.

Accordingly, I would deny plaintiff's motion for summary judgment and dismiss its petition, and grant the defendant's motion for summary judgment.

## CONCLUSION

Accordingly, the plaintiff's motion for summary judgment is granted; the defendant's cross-motion for summary judgment is denied; and judgment is entered for plaintiff in accordance with this opinion, with further proceedings stayed for a period of 90 days pursuant to Rule 167 pending an administrative determination of the equitable adjustment to which plaintiff is entitled.