**RAWLEIGH, MOSES & CO., INC.**
v.
**The UNITED STATES.**
No. 375-70.
United States Court of Claims.
Decided March 16, 1973.

Edwin J. McDermott, Philadelphia, Pa., of record, for plaintiff.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, JJ.

OPINION

PER CURIAM:

This case * was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 10, 1972. Plaintiff filed no notice of intention to except. On December 22, 1972, defendant duly filed a notice of intention to except. However, on February 7, 1973, defendant filed a request to withdraw its notice of intention to except which has been granted by the court. On February 12, 1973, plaintiff filed a motion under Rule 141(b) moving that the court adopt the commissioner's opinion, findings of fact and recommended conclusion of law as the basis for its judgment in the case.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby grants plaintiff's motion and adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover in accordance therewith and judgment is entered for plaintiff in the total sum of $55,300.40.

* The petition was filed by the E.C.T. Corporation as plaintiff. On February 2, 1973, an order was entered allowing plaintiff's motion to substitute Rawleigh, Moses & Co., Inc., as plaintiff in the case.

## OPINION OF COMMISSIONER

SPECTOR, Commissioner:

Plaintiff, a manufacturer of garments, was low bidder in response to an invitation for bids (IFB) published by defendant acting through the Defense Personnel Support Center (DPSC), a unit of the Defense Supply Agency (DSA). Its offer [1] was to supply 57,570 high temperature resistant flying shirts at a unit price of $15.84 (f.o.b. destination) and 56,070 pairs of high temperature resistent flying trousers at a unit price of $25.70 (f.o.b. origin) or $25.84 (f.o.b. destination).

The IFB contained the following information.

### NOTICE TO ALL OFFERORS

The following press release was issued 4 December 1968:

"Brigadier General W. M. Mantz, Commander, Defense Personnel Support Center, announced today that effective 18 December 1968, DPSC was instructing its buyers to include a discount limitation clause in those solicitations where excessive discounts are being encountered and are anticipated. The clause has been in use by other DSA Centers since 1966.

"(For text of clause, see page 56 herein.)"

This case hinges on the proper interpretation of the mentioned "discount limitation clause," which appeared on page 56, as follows:

170.7 DISCOUNT LIMITATION (DPSC 1969 MAY)

It is understood and agreed that, *for the purpose of payments* under this contract, an offer of prompt payment discount in excess of two percent shall be considered as a trade or special discount which shall be available to the Government as a reduction from the prices quoted, *without regard to whether invoices are actually paid within the designated discount period.* Offerors who desire to do so may quote customary terms of discount (not in excess of two percent), for prompt payment in addition to any trade or special discount available to the Government, *provided such discounts are stated separately* in their offers. Unless such trade or special discounts are separately stated, the offeror agrees that, when the discount offered exceeds two percent, *the entire discount will be considered as a trade or special discount and will not be treated as a discount for prompt payment.* [Emphasis supplied.]

In the blanks provided therefor, plaintiff had offered the following prompt payment discount:

DISCOUNT FOR PROMPT PAYMENT:

$2\frac{1}{10}\%$ 10 calendar days; $2\%$—30 calendar days; $Net\%$ 30 calendar days

* * *

Defendant considered that portion of plaintiff's prompt payment discount offer reading "$2\frac{1}{10}\%$ 10 calendar days" to be a trade or special discount, to be taken immediately from the prices bid, thereby reducing them by 2.1 percent to $15.50736 for each shirt, and $25.16030 for each pair of trousers. It awarded the contract at those reduced prices. Also, the award was made f.o.b. destination, and defendant now acknowledges that it incorrectly computed the price for the trousers on the f. o. b. origin bid, thus understating the contract price by $7,733.12.[2]

Plaintiff's reaction to the award was a letter of protest to the contracting officer stating:

We have received the Notice of Award dated October 30, 1969 stating the unit price for the Man's Flying Shirt to be $15.50786, and for the Man's Flying Trousers to be $25.-16080 [3] Our unit price bid for the

---

1. *See* findings 5 and 6 *infra.*

2. *See* finding 21 *infra.*

3. In the Notice of Award, the unit price for the shirts was $15.50736, and for the trousers $25.16030.

shirt was $15.84 and for the trousers was $25.84. This constitutes our protest. We will consult our attorney for the proper legal steps to take.

In the meantime, and without prejudice, we will perform under the contract.

The protest was denied, the contracting officer relying on a decision of the Comptroller General [4] for his interpretation of the discount limitation clause.

Plaintiff timely performed under the contract, delivering a total of 58,146 shirts and 56,628 pairs of trousers to DPSC's facility at Ogden, Utah. Deliveries were made over a period of several months, and plaintiff received 22 partial payments during the course of performance. Upon each delivery, plaintiff submitted an invoice to the Atlanta Regional Office of the Defense Contract Administration Services, which invoices contained the prompt payment discount terms that appeared on plaintiff's original bid, i. e., 2.1 percent 10 days; 2 percent 20 days; net percent 30 days. This phrase was required to be included by the authorized Government inspector, who would not sign the invoices unless they were presented in a form consistent with the contracting officer's interpretation of the contract, namely, that the 2.1 percent discount taken at the time of award, was still available to be taken again at time of payment.

In accordance with this interpretation, defendant took an additional prompt payment discount of 2.1 percent on 19 of a total of 22 invoices paid within 10 days, and a discount of 2 percent on one invoice paid within 20 days.[5] In summary, plaintiff's basic price was reduced by 2.1 percent, or $49,923.84 by way of a trade discount. Furthermore, defendant deducted an additional $47,567.28 from partial payments in the form of prompt payment discounts, as above-described.

Shortly after completion of its contractual obligation, plaintiff filed a petition in this court seeking reformation of the contract to reflect an award computed according to its bid. In an amendment to its petition, plaintiff also alleged that defendant, having availed itself of the trade or special discount at time of award, breached the contract by also deducting prompt payment discounts from plaintiff's invoices.

Defendant's answer avers, *inter alia* that:

> For the purpose of expediting proceedings herein, to the extent it may be concluded that plaintiff had an administrative remedy under the disputes procedure of the cited contract, any necessity that such procedure be exhausted as a prerequisite to a decision on the merits by this Court is hereby waived.

The Government also pleads by way of an affirmative defense or set-off that:

> * * * [W]ere it to be ruled that the prior reduction (trade discount) of 2 1/10% upon which the contract was awarded eliminated the 2 1/10% for consideration as a prompt payment discount when defendant paid invoices within 10 days, than [sic] in any event defendant would be entitled to the remaining 2% prompt payment discount when it made payments on plaintiff's invoices at the awarded price within 20 days. All invoices upon which 2 1/10% prompt payment discounts were taken * * * were paid within 20 days. Accordingly, were the 2 1/10% prompt payment discount held not available to defendant at the awarded price, plaintiff would be entitled to a refund of no more than 1/10% of the invoices on which the 2 1/10% was taken, which amounts to a total sum of $2,078.05.

It appears that the above-quoted discount limitation clause developed out of the following circumstances. During the 1960's, partly as a result of the Vietnam buildup, Defense Department agen-

---

4. B–167984, December 3, 1969.

5. The final two invoices were not eligible for prompt payment discount, and were paid net.

cies were relatively slow in paying vouchers. Contractors, aware of the fact that prompt payment discounts are taken into consideration in bid evaluation, frequently offered large prompt payment discounts (for example, 5.1 percent 10 days; 5 percent 20 days) with the realization that the 20-day discount would be taken into consideration in bid evaluation, but would rarely be earned by the Government because of slow payments. DSA had hoped to have the discount limitation clause it developed included in the Armed Services Procurement Regulations (ASPR), but its request was rejected. It was permitted to use the clause as a "deviation" from ASPR for a period of 1 year. The 1-year authorization was subsequently extended several times until May, 1971, when a new clause was adopted. The new clause contains the following additional language:

> NOTE: If an offeror submits discounts in excess of 2%, the highest of such discounts offered will be treated as a trade discount regardless of any time period attached to such discount. If the same offer also contains a prompt payment discount not in excess of 2%, this will be construed as an intent to offer trade and prompt payment discounts cumulatively. In such case, the trade discount will be deducted from the contract price upon award and the prompt payment discount will be taken, if earned. (*For example: 4%—10 calendar days, 3%—20 calendar days, 2%—30 calendar days. The 4%—10 calendar days (being the largest of those in excess of 2%) will be taken as a trade discount and the bid price reduced 4% in determining the contract price. The 2%—30 days will be taken as a prompt payment discount, if earned.*)

The new language set forth above was added to the discount limitation clause at the suggestion of the Defense Supply Agency Headquarters to resolve a "dichotomy between the Comptroller General's decisions and the ASBCA case." [6]

Mr. Rose, plaintiff's president, testified that he had interpreted the original discount limitation clause (the one appearing in his contract) to mean that "the Government ha[d] to make up their [sic] mind to either take the 2½₀ per cent as a trade discount, or take it as a prompt payment discount, but they [could not] take both."

The testimony of one of the defendant's principal witnesses [7] is not inconsistent with this interpretation of plaintiff.[8] In contrast, the contracting officer testified that it was his interpretation that trade discounts "would be taken off the top." He acknowledged, however, that the term " 'trade discount' is foreign to our bidding in clothing and textiles." It was first introduced, he explained, in the wording of the discount limitation clause.

That the DSA did not always take a prompt payment discount "off the top" at time of award, is illustrated by the following example. On May 8, 1969, plaintiff and others were notified by the Defense Supply Agency that Mason & Hughes, Inc., was the successful offeror on a solicitation for 70,461 intermediate cold weather jackets at a unit price of $9.8675 and award was made at that same price. The information to bidders/offerors portion of the IFB on that solicitation contained the identical notice to all offerors concerning the inclusion of the discount limitation clause, and the identical discount limitation clause found in the invitation portion of plaintiff's contract. Discount terms offered by the successful offeror (Mason

6. These last quoted words are from the testimony of Grover Dean Fogle, Chief, Policy Branch, Procurement Division, DSA. The "ASBCA case" referred to is So-Sew Styles, Inc., ASBCA No. 15467, 71–1 BCA ¶ 8844, which bears a date approximately 1 month prior to the addition of the above-quoted "NOTE" to the discount limitation clause.

7. The Mr. Fogle mentioned in the preceding footnote.

8. *See* finding 24 *infra*.

& Hughes, Inc.) were 2.05 percent—10 days; 2 percent—20 days; 1.95 percent —30 days.

It also should be observed that the discount limitation clause does not appear to have served the historical purpose intended (as above-outlined) in the case of this particular solicitation. The 2.1 percent 10-day prompt payment discount, twice taken under the contracting officer's interpretation, was not a large discount of the type to be taken into consideration in bid evaluation, and then not earned because of slow payments. That is because this contract further provided that:

> * * * Notwithstanding the fact that a blank is provided for a ten (10) day discount, prompt payment discounts offered for payment within less than twenty (20) calendar days will *not* be considered in evaluating offers for award * * *. However, offered discounts of less than 20 days will be taken if payment is made within the discount period, even though not considered in the evaluation of offers. [Emphasis supplied.]

On this latter point, plaintiff's president testified that he considered the above-quoted bid evaluation clause along with the discount limitation clause when they first appeared in IFB's issued by the DSA. He testified that he did not wish "to take any chances on how [the discount limitation clause] would be interpreted," and therefore sometimes bid 2 percent, 10 days, 1.9 percent, 20 days. Other bids were submitted, however, as in this case, with prompt payment discounts of 2.1 percent, 10 days, 2 percent, 20 days. The witness felt that the Government might take the discount in excess of 2 percent as a trade discount,

and then pay in 20, 30, or even 60 days. Mr. Rose also felt that the 0.1 percent was such a very small amount over 2 percent that it would not cause the discount limitation clause to be invoked.

It is apparent that from the foregoing that if defendant's representatives intended to convey the meaning ultimately expressed in the "NOTE" appended in 1971 to the discount limitation clause,[9] that meaning was inadequately conveyed in the contract clause as it appeared in plaintiff's contract.

The first sentence of the latter clause suggests, upon a reasonable reading, that a prompt payment discount in excess of 2 percent will be taken at the time of *payment* "without regard to whether invoices are actually paid within the designated discount period." It does not infer a discount taken "off the top."

The second sentence of that clause reasonably suggests that a prompt payment discount may also be taken, but only if separately stated. Plaintiff's single stated "Discount for Prompt Payment" for 10 and 20 days does not convey an intent to offer such a "separately stated" discount.

The last sentence reiterates the meaning conveyed by the first two sentences and, in addition, strongly infers that only one discount will be taken if, as in this case, it is taken "as a trade or special discount."

In summary, a reasonable reading of the clause strongly supports the interpretation placed upon it by the contractor, rather than that urged by the contracting officer. Even were that not so, plaintiff would be entitled to prevail in its interpretation [10] because it is a rea-

---

9. *See* finding 22 *infra.*

10. Under the long established rule, *contra proferentem*, as enunciated, for example, in United States v. Seckinger, 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); J. W. Bateson Co. v. United States, 450 F.2d 896, 196 Ct.Cl. 531 (1971); Leavell-Morrison-Knudsen-Hard-

eman v. United States, 436 F.2d 451, 193 Ct.Cl. 949 (1971); Sherwin v. United States, 436 F.2d 992, 193 Ct.Cl. 962 (1971); Max Drill, Inc. v. United States, 427 F.2d 1233, 192 Ct.Cl. 608 (1970); Gorn Corp. v. United States, 424 F.2d 588, 592, 191 Ct.Cl. 560, 567 (1970); Paschen Contractors, Inc. v. United States, 418 F.2d 1360, 190 Ct.Cl. 177,

sonable one. As stated by the court in WPC Enterprises, Inc. v. United States:[11]

&ast; &ast; &ast; It is precisely to this type of contract that this court has applied ·the rule that if some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted—unless the parties' intention is otherwise affirmatively revealed. [Citing cases.] This rule is fair both to the drafters and to those who are required to accept or reject the contract as proffered, without haggling. &ast; &ast; &ast;

That plaintiff's interpretation of the discount limitation clause is a reasonable one, is perhaps best illustrated by the fact that the ASBCA has also placed the same interpretation upon it.[12] In both So-Sew Styles, Inc., ASBCA No. 15467, 71–1 BCA ¶ 8844, and Chic de Paris Handbag Co., ASBCA No. 14622, 70–1 BCA ¶ 8160; it was concluded that a discount limitation clause in the form contained in this contract, does not change the normal practice of regarding discounts expressed as these were, as being in the alternative, and not cumulative.[13]

Furthermore, the contracting officer acknowledged that the term "trade discount" is "foreign to our bidding in clothing and textiles." So unusual is the offer of a trade discount by contractors regularly supplying clothing and textiles to defendant, that in 1966 the ASBCA held a contracting officer to be on notice of a possible bidding error, when a contractor's bid appeared to offer a trade discount, in addition to the offer of a prompt payment discount.[14]

All of the foregoing considered, it is concluded that the bid and resultant contract documents, construed as a whole, manifested an intent on the part of plaintiff to offer a prompt payment discount of 2.1 percent for payment within 10 calendar days; that the discount limitation clause probably contemplated the taking of that discount at time of *payment* "without regard to whether invoices [were] actually paid within the designated discount period"; that the taking of the discount immediately upon award as a reduction in contract price nevertheless amounted to the same thing, and was reasonably within the contemplation of the clause; but that defendant was not thereafter entitled to take the discount again at time of payment. The latter intent is adequately expressed in the "NOTE" added to the discount limitation clause in 1971,[15] but

---

(1969); Tecon Corp. v. United States, 411 F.2d 1262, 188 Ct.Cl. 15 (1969); D & L Constr. Co. v. United States, 402 F.2d 990, 185 Ct.Cl. 736 (1968); Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968); Southern Constr. Co. v. United States, 364 F.2d 439, 453, 176 Ct.Cl. 1339, 1362 (1966); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876–877, 163 Ct.Cl. 1, 6 (1963), and Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947).

11. Note 10 *supra*.

12. Although not in this particular case. (*See* finding 17 *infra*, and note 6 *supra*.)

13. As observed in So-Sew Styles, Inc., 71–1 BCA ¶ 8844 at 41,119:
"&ast; &ast; &ast; When treated as prompt payment discounts, the discounts inserted in the 'Discount For Prompt Payment' block

have always been interpreted as alternative rather than cumulative.
"&ast; &ast; &ast; Whereas the IFB required that the 2.05% discount be treated as a trade discount and therefore deductible regardless of when payment is made such discount did not lose its identity as an offer of a prompt payment discount. It remained in the 'Discount For Prompt Payment' block. Under the circumstances, appellant's offers of discounts in the customary form for offering alternative prompt payment discounts cannot be reasonably interpreted as manifesting an unexpressed intent to offer cumulative discounts."

14. Southern Athletic Co., ASBCA No. 10674, 66–1 BCA ¶ 5655 (aff'd on reconsideration, 66–2 BCA ¶ 5777).

15. *See* finding 22 *infra*.

it was not so expressed in this contract, nor in the other cases earlier cited in this opinion.[16] Having immediately availed itself of the 2.1 percent prompt payment discount (considered as a trade or special discount), defendant improperly deducted further discounts from the invoices submitted by plaintiff during the course of the contract.

Plaintiff is therefore entitled to judgment in the amount of $55,300.40, that being the sum of $47,567.28 in prompt payment discounts erroneously deducted; and $7,733.12 resulting from the contracting officer's admitted error in computing the award for the trousers on an f.o.b. origin basis, rather than on an f.o.b. destination basis as the contract prescribed.

16. Clarification of the clause was also apparently prompted in part by letter from the General Accounting Office to the DSA, advising:

"While our decisions support the DPSC interpretation [permitting a deduction of both a prompt payment discount for one period in excess of 2 percent, after conversion to a trade discount, and a prompt payment discount of 2 percent or less for another period], in view of the number of apparent misinterpretations by bidders we recommend that the clause (as well as any similar clause which may now be in use by any other Defense Supply Agency procuring activity) be reworded so as to more clearly state the Government's intention, in order to minimize further questions by bidders as to the effect of the clause. * * *" [Unpublished Opinion, B–171731, April 6, 1971.]

